RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0240p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

STEVEN HARLAMERT, Individually and as
Administrator of the Estate of John Harlamert,

*Plaintiff-Appellee,*

*v.*

WORLD FINER FOODS, INC.,

*Defendant-Appellant.*

No. 06-3584

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 02-00089—Walter H. Rice, District Judge.

Argued: March 14, 2007

Decided and Filed: June 25, 2007

Before: MARTIN and CLAY, Circuit Judges; POLSTER, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Frank Holahan, McELROY, DEUTSCH, MULVANEY & CARPENTER, Ridgewood, New Jersey, for Appellant. Rachael L. Rodman, CHERNESKY, HEYMAN & KRESS, Dayton, Ohio, for Appellee. **ON BRIEF:** Frank Holahan, McELROY, DEUTSCH, MULVANEY & CARPENTER, Ridgewood, New Jersey, Brian D. Wright, FARUKI, IRELAND & COX, Dayton, Ohio, for Appellant. Rachael L. Rodman, Thomas P. Whelley II, CHERNESKY, HEYMAN & KRESS, Dayton, Ohio, for Appellee.

_____

## OPINION

_____

POLSTER, District Judge. Steven Harlamert, Administrator of the Estate of his deceased father John Harlamert (the "Estate"), initiated this declaratory judgment action against World Finer Foods, Inc. ("WFF"), a closely held corporation. The Estate contends that it is permitted to freely transfer the ten shares of WFF stock owned by John Harlamert prior to his demise. WFF contends that the shares are subject to a shareholder agreement that restricts the transfer of that stock to the company. After a bench trial, the district court granted judgment in favor of the Estate. WFF

_____

[*] The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

appeals the district court's factual and legal findings and conclusions.  For the following reasons, we **AFFIRM**.

## I.   BACKGROUND

In 1971, John Fressie, a buyer and packager of food seasonings, approached some of his distributors suggesting that they form a company to package and distribute specialty food products, mostly under the company's private label, giving shareholder-distributors deep discounts and annual cash rebates.  In August 1971, Fressie incorporated that company, now known as WFF, under the name V.I.P. Foods, Inc. ("VIP").  In April 1980, VIP changed its name to Reese Finer Foods, Inc. ("Reese"), and, in July 1994, Reese changed its name to WFF.[1]

At its formation in 1971, there were only five shareholders of VIP stock: John Fressie, the President of VIP who managed day-to-day operations, and distributors Gary Greenhouse, Harry Mains, Heffner Food Products and Norman Wine.  Each member received a certificate for 200 shares of VIP stock, of a total 1000 authorized shares.

The first meeting of VIP, held on August 20, 1971, was attended by all shareholders except Wine.  The meeting minutes reflect: "A buy or sell agreement will be incorporated, which will give the corporation first option on purchasing original stock within 90 days.  The value of the stock will be placed at book value."  (J.A. 481.)

A second shareholder meeting was held on October 30, 1971.  The minutes of that meeting reflect: "The buy-sell agreement was reviewed.  Gary Greenhouse move [sic] the discussion be tabled at the present time."  (J.A. 482.)

To add new shareholders without increasing the number of authorized shares, the original five shareholders agreed in early 1972 to transfer 190 shares each back to VIP.  In March 1972, Fressie invited six more distributors to become VIP shareholders.  One of those distributors was John Harlamert, who owned a distributorship called Arlowe Specialty Food Co., Inc.[2]

On March 3, 1972, a VIP meeting was commenced in St. Louis, Missouri, attended by the original five shareholders and the six new shareholders (Harlamert, the Barzizza brothers, Sidney Knight, Art Kehe, Sam Zuckerman Co., and L.D. Jones Food Co.).  All shareholders received a certificate for ten shares of VIP stock bearing the following typewritten legend:  "March 3, 1972: These securities may be transferred only through the company and only in compliance with the agreement between this share holder and the company."  (J.A. 484.)  The meeting minutes reflect that "[a] resolution on the face of the stock eliminates the need for a buy sell agreement."  (J.A. 485.)

Five days later, on March 8, 1972, four of the eleven shareholders present at the March 3rd meeting (Fressie, Kehe, Heffner, and the Barzizza brothers) signed individual shareholder agreements.  Among other things, the executed agreements required a deceased shareholder's personal representative to sell back to VIP, and VIP to purchase, that shareholder's stock for the greater of $40 per share or 80% of book value.  The agreements also required VIP to redeem those shares within thirty days of the shareholder's death.  There is no evidence that the shareholder agreements signed on March 8, 1972 actually existed on the date the stock certificates were issued, i.e., March 3, 1972.

---

[1] Although VIP, Reese and WFF are the same corporate entity, we will refer to the company using its name at the time the events under discussion occurred.

[2] Harlamert had an established relationship with Kroger which, presumably, made his membership in VIP very attractive to the existing shareholders.

John Harlamert remained a shareholder of WFF stock until his death on October 13, 1994. Contrary to the thirty-day redemption provision in the shareholder agreement, WFF did not attempt to redeem Harlamert's shares until January 31, 1995, more than 100 days after Harlamert's death, by tendering a check in the amount of $43,240.68 to James Kordik, who had been Harlamert's attorney. Harlamert's heirs have refused to tender their father's shares of WFF stock to the company. Steven Harlamert has filed this action seeking an order declaring that the Estate is not subject to the shareholder agreement and its restriction on transferring a decedent shareholder's stock. The Estate has received permission from the Montgomery County Probate Court to transfer the stock to Steven Harlamert. The parties agree that Steven, the beneficial owner of all outstanding shares in Arlowe, is entitled to all shares of WFF stock, subject only to this litigation.[3]

After a bench trial, the district court found, based on a preponderance of the evidence, that Harlamert did not enter into a shareholder agreement with VIP, Reese or WFF; that he was not aware of the existence of such an agreement when he purchased the ten shares of VIP stock; and that he did not accept any benefits of such an agreement between VIP, Reese or WFF and their shareholders. The court noted that, if it had found otherwise on this last issue, it would have been necessary to address Plaintiff's alternative argument that WFF waived its rights under the shareholder agreement by failing to redeem Harlamert's shares within thirty days of his death.

## II.    JURISDICTION

We have jurisdiction to review the district court's ruling in this declaratory judgment action under 28 U.S.C. § 1291.

## III.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 52(a), findings of fact by a district court "shall not be set aside unless clearly erroneous." *Id.* "A finding of fact is clearly erroneous when, although there is evidence to support it, 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *The Coy/Superior Team v. BNFL, Inc.*, 174 F. App'x 901 at *3 (6th Cir. 2006) (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985), in turn quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). This standard does not entitle the reviewing court to reverse a factual finding simply because it is convinced that it would have decided the case differently. *Anderson*, 470 U.S. at 573. If the district court's account of the evidence is plausible in light of the entire record, this court may not reverse that accounting, even if convinced that, had it been sitting as trier of fact, it would have weighed the evidence differently. *Id.* at 574-75. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be deemed clearly erroneous. *Id.* at 574. "This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Id.*

## IV.    LAW AND ANALYSIS

Generally speaking, the securities of a corporation are freely transferable. Pursuant to Delaware statute, however, a written restriction on the transfer of a security of a corporation, noted conspicuously on the certificate, may be enforced against the holder of the restricted security or any successor or transferee of the holder including an estate administrator. 8 Del. Code Ann. § 202(a). Unless noted conspicuously on the certificate, a restriction "is ineffective except against a person with actual knowledge of the restriction." *Id.* A transfer restriction "may be imposed by the certificate of incorporation or by the bylaws or by an agreement among any number of security holders or among such holders and the corporation." 8 Del. Code Ann. § 202(b). However, "[n]o

---

[3] John Harlamert's only other heir, a daughter, gave up her interest in the WFF shares.

restrictions so imposed shall be binding with respect to securities issued prior to the adoption of the restriction unless the holders of the securities are parties to an agreement or voted in favor of the restriction." *Id*.

## A.

As discussed, Harlamert's stock certificate contains the written restriction: "March 3, 1972: These securities may be transferred only through the company and only in compliance with the agreement between this share holder and the company." (J.A. 484.) Although WFF contends that the transfer restriction is conspicuous, such contention is meaningless if the certificate was issued prior to the adoption of the restriction unless Harlamert was a party to the agreement referenced therein or had actual knowledge of the restriction when the certificate was issued to him.[4]

WFF claims that John Harlamert was a party to and is bound by the shareholder agreement. It argues that the district court committed clear error when concluding that John Harlamert never executed an agreement. We disagree. Neither the parties nor their counsel were able to locate a signed agreement despite diligent efforts. Company officials testified that they did not routinely require shareholders to sign such agreements. And, of the eleven shareholders who attended the March 3, 1972 meeting, only four had signed agreements in their files.

WFF argues that Defendant's Exhibit No. 30-A proves that Harlamert did in fact execute a shareholder agreement, and that the district court abused its discretion when it refused to admit the exhibit as evidence. Exhibit No. 30-A is a certification by John Bennett, Reese's legal counsel, filed on behalf of John Fressie in a prior case.[5] Bennett certifies, in pertinent part:

> First, I understand that defendants contend that the Reese shareholder agreement confers no right to purchase Reese products for distribution. As counsel for Reese, I drafted the shareholder agreement [FN] in 1971 and can state unequivocally that the position Reese takes today in an effort to legitimize its exclusion of Fressie and refusal to sell Reese products to Bascom is totally inconsistent with its shareholders' intentions in 1971 and with the history of the corporation from 1971 to 1988.

(J.A. 1022-23.) The footnote states: "A copy of the shareholder agreement, executed in identical form by each Reese shareholder, is annexed as Exhibit 13 to the Fressie affidavit executed March 15, 1989." (J.A. 1023.) The district court refused to admit this document for two reasons: (1) the document was not properly authenticated, and (2) it was an out-of-court statement being offered to prove the truth of the matter asserted therein (i.e., all shareholders signed shareholder agreements).

A district court's ruling on the admission of evidence is reviewed for abuse of discretion. *Trepel v. Roadway Exp., Inc.*, 194 F.3d 708, 716 (6th Cir. 1999). An abuse of discretion is defined as "a definite and firm conviction that the trial court committed a clear error of judgment." *Id*.

We find that the district court did not abuse its discretion in refusing to admit the document on authenticity grounds. Federal Rule of Evidence 901 requires some type of testimony showing that the document is what the party offering it says it is, i.e., a certification filed in federal court by John Bennett. At the bench trial in this case, John Beers was unable to authenticate either a signed or unsigned version of the document. The district court struck the exhibit subject to possible

---

[4] While the statute permits a restriction on transferability if the shareholder has voted in favor of the restriction, there is no evidence, and no one has argued, that Harlamert ever voted in favor of the transfer restriction.

[5] In 1988, Fressie was forced out by disgruntled shareholders and replaced by John Beers. Fressie subsequently sued and settled that suit for between $2 and $3 million.

admission based on the testimony of John Fressie.  John Fressie could not authenticate the document, and was unable to recall it.

Nor did the district court abuse its discretion by refusing to admit the document on hearsay grounds.  Contrary to WFF's argument, the document does not fall within the hearsay exception for public records under Federal Rule of Evidence 803(8) because it is not a record of a public office or agency setting forth (1) "the activities of the office or agency," (2) "matters observed pursuant to a duty imposed by law as to which matters there was a duty to report . . ." or (3) " . . . factual findings resulting from an investigation made pursuant to authority granted by law . . . ." *Id.*  The document does not fall within the hearsay exception for former sworn testimony under Federal Rule of Evidence 804(b)(1) because WFF failed to show that Mr. Bennett was unavailable to testify at trial, and it is debatable whether the document falls within the catch-all hearsay exception for evidence "having equivalent circumstantial guarantees of trustworthiness."  Fed. R. Evid. 807.

Even if Bennett's certification were admissible, it would not impact our ruling that the district court did not clearly err when it concluded that Harlamert did not sign a shareholder agreement.  The certification is just about the only evidence in the record indicating that Harlamert *may* have done so.

## B.

Next, WFF argues that the district court erred when it concluded that Harlamert was not aware of the transfer restriction at the time he purchased his stock on March 3, 1972.  The district court reviewed and discussed the evidence.  It found that the legend on Harlamert's stock certificate suggested that he may have been aware of the agreement and its restrictions on March 3rd, but determined that the value of that evidence was negated by the fact that the minutes for the March 3rd meeting stated only that "a resolution on the face of the stock eliminates the need for a buy sell agreement." (J.A. 485.)  Furthermore, while the fact that four shareholders signed shareholder agreements on March 8, 1972 created the inference that the form agreement was discussed at the meeting five days earlier, that inference was negated by the fact that seven of the shareholders did not sign the agreement.  The court found significant the fact that the first mention in the record of a shareholder agreement with transfer restrictions consistent with those contained in the form agreement was on March 8, 1972, five days *after* Harlamert purchased his shares of VIP stock.  The court deduced that the evidence indicating that Harlamert was unaware of the shareholder agreement and its transfer restrictions on March 3rd was more persuasive than the evidence indicating that he was so aware, and concluded that he was not aware of the agreement when he bought his stock.

There is additional evidence in the record supporting the district court's finding that Harlamert was not aware of the shareholder agreement, and its restriction on the transfer of a decedent's shares, when he purchased his stock.  Founding shareholder Greenhouse did not remember discussing any transfer restrictions at the March 3, 1972 meeting.  The only discussions Fressie remembered regarding any transfer restrictions "in the early years" was the intent to ensure that stock "stayed in the hands of people who were selling VIP or Reese food products." (J.A. 1412-13.)  The overriding intent of any restrictions, voiced by both Fressie and Greenhouse, was to keep VIP stock in the hands of food distributors selling VIP products, not speculators or passive investors.  Both Greenhouse and Fressie testified that they believed the stock could pass to a family member who was a food distributor.  Harlamert's discussions with his attorneys regarding his estate plan indicate that he was unaware of any restriction on transferring his shares to his children, and his estate plan confirms this.

There is also evidence that Harlamert was in fact aware of the shareholder agreement, including a letter from Reese's counsel to Harlamert in which an unsigned copy of a form shareholder agreement was enclosed.  However, all this evidence postdates March 3, 1972 by years

if not decades, and does not establish that Harlamert was aware of the existence of a shareholder agreement containing the transfer restriction in question when he obtained his shares on March 3, 1972.

WFF cites several cases in support of its position that Harlamert was aware of the shareholder agreement when he purchased his stock. The cases are all distinguishable. Either the shareholder in the cited cases had knowledge of the specific transfer restrictions when he purchased the shares,[6] was a successor-in-interest to a person plainly bound by the restriction,[7] or obtained shares that unambiguously referred to the location of the restriction.[8] Harlamert was an original owner of his stock, and his certificate did not specify the restriction at issue or direct him to any record where such restriction could be viewed.

In sum, there is sufficient evidence in the record to support a finding that Harlamert was not aware of the shareholder agreement when he purchased his stock (as the district court concluded), as well as a finding that he was aware of the agreement when he purchased his stock (as WFF argues). Where two permissible views of the evidence exist, the factfinder's choice between them cannot be deemed clearly erroneous. *Anderson*, 470 U.S. at 574.

## C.

WFF argues that the district court clearly erred when it refused to find that Plaintiff was estopped from denying Harlamert was bound to the shareholder agreement and its transfer restrictions. The district court noted that WFF relied upon cases decided by Delaware courts holding that a party who takes advantage of a contract is estopped from denying that he is bound by it. After reviewing those cases, the court concluded that Harlamert would be estopped from denying that he was bound by the shareholder agreement if he had taken advantage of the agreement by receiving some benefit from it. The court concluded, however, that "there is simply no evidence that Harlamert ever took advantage of or received a benefit from any shareholder agreement." (J.A. 188.)

While there is plenty of evidence that Harlamert benefitted from his status as a shareholder-distributor of WFF products, there is little, if any, evidence that the shareholder agreement conferred a tangible benefit upon him. Any perceived benefit would have been fairly dispersed among the shareholders generally and does not leave us with the definite and firm conviction that a mistake has been committed by the district court. *The Coy/Superior Team*, 174 F. App'x 901 at *3; *Anderson*, 470 U.S. at 573; *United States Gypsum Co.*, 333 U.S. at 395.

In any event, if we are to hold Harlamert to the terms and conditions of an agreement that he did not sign, we must hold WFF to the same terms and conditions. Because WFF failed to

---

[6] *Pitman v. Young*, No. 01-95-00771-CV, 1998 WL 499012 (Tex. App. Aug. 20, 1998); *First Nat'l Bank of Canton v. Shanks*, 34 O.O. 359, 73 N.E.2d 93 (Ohio Com. Pl. 1945).

[7] *Menaker v. Padover*, 427 N.Y.S.2d 495, 75 A.D.2d 807 (N.Y. App. 1980).

[8] *Weissman v. Lincoln Corp.*, 76 So. 2d 478 (Fla. 1954); *Bloomingdale v. Bloomingdale*, 107 Misc. 646 (N.Y. 1919); *Gibbs v. Long Island Bank*, 31 N.Y.S. 406, 408 (1894). In *Weissman*, for example, the legend on the stock certificate provided:

> The original of this stock is subject in all respects to the terms of a stockholders' agreement made under date of March 13, 1946, the text of which is included among the minutes of the meeting of the Board of Directors and Stockholders held on March 13, 1946, and all persons to whom these presents may come are referred to the said minutes for the text of said stockholders' agreement.

*Id*. at 483.

redeem Harlamert's shares within thirty days of his death, we find that WFF waived its right to redeem those shares.

## V.

For these reasons, we **AFFIRM** the district court's rulings.