GRIFFIN, J., delivered the opinion of the court, in which MERRITT, J., joined, and SUTTON, J., joined in part.
MERRITT, J. (pp. 560-61), delivered a separate concurring opinion. SUTTON, J. (pp. 561-63), delivered a separate opinion concurring in part and dissenting in part.
OPINION
GRIFFIN, Circuit Judge.
This is an action under the Labor-Management Relations Act (LMRA), 29 U.S.C. § 185 et seq., and the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq. Defendants are Kelsey-Hayes Company and its parent com *549 pany, TRW Automotive. Plaintiffs are a class of 400 retired union workers from the now-closed Kelsey-Hayes automobile-manufacturing plant in Jackson, Michigan. Defendants appeal the district court’s grant of summary judgment, injunctive relief, and attorney fees in favor of plaintiffs. We affirm.
I.
Plaintiffs worked at the Jackson plant until July 2006, when it shut down. All plaintiffs retired under one of three CBAs that were negotiated in 1995, 1999, and 2003; each of those CBAs contained identical language -with regard to the' issues pertinent to this appeal. Specifically, the CBAs provided, in a supplement, that Kelsey-Hayes would establish a health insurance plan, “either through a self-insured plan or under a group insurance policy or policies issued by an insurance company....” Article III, Section 1 outlined specific types of health care services to which employees were entitled. Article I, Sections 3(b)(7) and 3(b)(8) provided:
[Section 3(b) ](7) For Retired Employees and Certain Former Employees
The Company shall contribute the full premium or subscription ■ charge for health care coverages continued in accordance with Article III, Section 5, for:
(i) A retired employee and his eligible dependents, if any, provided such retired employee is eligible for benefits under Article II of the Kelsey-Hayes Hourly-Rate Employees Pension Plan and;
(ii) An employee and his eligible dependents, if any, terminating at age 65 or older for any reason other than a discharge for cause with insufficient credited service to entitle him to a benefit under Article II of the Kelsey-Hayes Hourly-Rate Employees ■ Pension Plan.
[Section 3(b) ](8) For Surviving Spouses
(i) The Company shall contribute the full premium or subscription charge for health care coverages continued in accordance with Article III, Section 6(b) on behalf of a surviving spouse ... and the eligible dependents of any such spouse....
In turn, Article III, Section 5 provided, in relevant part:
The health care coverages an employee has under this Article at the time of retirement or termination of employment at age 65 or older for any reason other than a discharge for cause ... shall be continued thereafter provided that suitable arrangements for such continuation[ ] can be made with the carrier(s). Contributions for such coverages so continued shall be in accordance with Article I, Section 3(b)(7).
Finally, Article I, Section I contained what the parties have termed a “mutual agreement clause.” That clause provided:
In the event the initiation of any benefit or benefits described in Article III of the Program does not prove practicable or is not permitted by the plans under which coverages are now provided on the dates stipulated in such Article III, the Company in agreement with the Union will provide new benefits and/or coverages as closely related as possible and of equivalent value to those not provided.
Consistent with the commitments set forth in the CBAs, Kelsey-Hayes provided health care for plaintiffs and their families both before and after the Jackson plant closed. This health care took the form of group insurance plans provided by private insurance companies, occasionally supplemented by available government benefits, such as Medicare Parts A and B. For example, after 2003, plaintiffs were initially *550 enrolled in group coverage from Blue Cross Blue Shield of Michigan. The group coverages were changed twice after 2003— Blue Cross Blue Shield of Michigan was replaced with Meritan, and later Meritan was replaced with Humana.
In late 2011, however, things changed. In September 2011, TRW (which had purchased Kelsey-Hayes) sent a letter to plaintiffs indicating that it would be discontinuing group health care coverages beginning in 2012. Instead of group coverages, defendants would be providing plaintiffs with “Health Reimbursement Accounts” (HRAs). The HRAs were designed to function, essentially, as a health care voucher system; according to the letter, TRW would make a “one-time contribution [into the HRAs] of $15,000 for each eligible retiree and his or her eligible spouse” in 2012, and “beginning in 2013, TRW [would] provide a $4,800 credit [into the HRAs] ... for each eligible retiree and eligible spouse.” The notion was that plaintiffs would then use these funds to purchase their own insurance from among a variety of providers.
The HRAs differed from the prior group coverages in that they shifted risk — and potentially costs — off of defendants and on to plaintiffs. At the deposition of TRW Benefit Director Shelly Iacobelli, it was established that, under the HRAs, plaintiffs “bear[ ] the risk of expenses that exceed the company contribution!.]” For example, as Iacobelli confirmed, if a retiree spent $20,000 in 2012, the retiree would be responsible for the $5,000 spent in excess of the $15,000 in his or her HRA. Iacobelli admitted that in this way, the HRAs “shifted [the risk of excess costs] to the retiree[s,]” as “that risk used to be borne by the insurance company” under the prior group coverages. Similarly, TRW’s Vice-President of Compensation and Benefits, Steve Kiwicz, at his deposition agreed that, under the HRAs, it was “the retirees who bear the risk of excessive costs” beyond the level that the HRAs were funded; therefore, Kiwicz testified, the company had “limited its expenses” to the amount it had agreed to place into each HRA.
Although TRW pledged to fund each HRA with $15,000 in 2012 and $4,800 in 2013, TRW and Kelsey-Hayes failed to commit to any funding of the HRAs beyond 2013. In this regard, Kiwicz testified that no commitments had been made past 2013, and Iacobelli testified that she did not know “what the plans are for 2014 and beyond” as to retiree health care. In fact, TRW claimed the right to unilaterally terminate the HRAs entirely' — in the September 2011 letter, TRW indicated that it “retain[ed] the right to amend or terminate the HRA[s]” altogether. In a pamphlet sent to plaintiffs explaining the HRAs, TRW asserted that it had the right to “at any time, increase, decrease, or eliminate the amount that is allocated to [the HRAs] each year,” and that, in TRW’s view, plaintiffs were “neither vested in [their] retiree healthcare benefits, nor [does] TRW intend to vest [plaintiffs] in retiree healthcare benefits.... TRW Automotive reserve[s] the right to amend, modify, suspend, replace or terminate any of its plans, policies or programs (including the HRA [s])....”
Following the implementation of the HRAs, plaintiffs filed this action, claiming that the health plan change to HRAs breached the CBAs, in violation of Section 301 of the LMRA and ERISA. The district court allowed plaintiffs to proceed as a class and granted their motion for summary judgment on all claims, ruling that the CBAs established a commitment to lifetime health care benefits for plaintiffs and their families, and that defendants’ unilateral implementation of the HRAs constituted a breach of the CBAs. In *551 granting summary judgment and a permanent injunction, the district court ordered defendants to reinstate the “status quo,” that is, the health coverages that had been in effect up until 2012. The district court also awarded attorney fees to plaintiffs. Defendants timely appealed.
II.
A.
This court reviews de novo a district court’s grant of summary judgment. Parsons v. City of Pontiac, 533 F.3d 492, 499 (6th Cir.2008). Summary judgment is proper where “the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(a). When determining whether the movant has met this burden, this court views the evidence in the light most favorable to the nonmoving party. Smith Wholesale Co., Inc. v. R.J. Reynolds Tobacco Co., 477 F.3d 854, 861 (6th Cir.2007).
B.
Before turning to the facts of this case, we first address a threshold legal issue. Specifically, it is necessary for us to correct defendants’ misapprehension regarding a pair of our prior cases: Reese v. CNH Am. LLC, 574 F.3d 315 (6th Cir. 2009) (Reese I) and Reese v. CNH Am. LLC, 694 F.3d 681 (6th Cir.2012) (Reese II). In this regard, a brief overview of this court’s admittedly complex case law on retiree benefits is instructive.
Our leading case on retiree benefits is UAW v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir.1983). The issue in Yardr-Man was whether the right to collectively-bargained-for insurance benefits survived the expiration of the agreement in which they were bargained. In other words, did the retirement insurance benefits vest? The court explained that “whether retiree insurance benefits continue beyond the expiration of the collective bargaining agreement depends on the intent of the parties,” and that “traditional rules of contractual interpretation are applied” to determine whether the parties so intended. Id. at 1479. The first place to look in discerning the parties’ intent is the explicit language of the collective bargaining agreement. Id. “[Ejach provision should be construed consistently with the entire document,” and the terms “must be construed so as to render none nugatory and avoid illusory promises.” Id. at 1479-80. If the language of the CBA is ambiguous, courts may refer to extrinsic evidence in addition to the CBA to discern the parties’ intent. Id. at 1480; see also Moore v. Menasha Corp., 690 F.3d 444, 451 (6th Cir.2012); Cole v. ArvinMeritor, Inc., 549 F.3d 1064, 1069-70 (6th Cir.2008).
In Yardr-Man, the “key provision” of the CBA stated:
“When the former employee has attained the age of 65 years then:
(1) The Company will provide insurance benefits equal to the active group benefits ... for the former employee and his spouse.”
Id. at 1480. The court ultimately concluded that, based on the language of the CBA and in the context of surrounding CBA provisions, the parties intended for the insurance benefits to vest. Id. at 1481-82.
In reaching its conclusion, the Yardr-Man court reasoned that “the context in which these benefits arose demonstrates the likelihood that continuing insurance benefits for the retirees [beyond the expiry of the CBA] were intended.” Id. at 1482. The court reasoned that “it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, *552 would be left to the contingencies of future negotiations.” Id. Additionally, “retiree benefits are in a sense ‘status’ benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained.” Id. Accordingly, “when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree.”. Id. (emphasis added). This rule has come to be known as the “Yardr-Man inference.”
In subsequent years, we continued to refine and clarify the scope both of the Yard-Man inference and vested retiree benefit rights more generally. Among other things, these cases clarified that the Yard-Man inference was not a legal presumption that shifted the burden to the employer to disprove that benefits vested. See, e.g., Yolton v. El Paso Tenn. Pipeline Co., 435 F.3d 571, 580-81 (6th Cir.2006); Maurer v. Joy Tech., Inc., 212 F.3d 907, 915 (6th Cir.2000) (“Although there is an inference that the parties to a CBA intended for retiree benefits to vest, the burden of proof does not shift to the employer, and it is not required that specific anti-vesting language be used before a court can find that the parties did not intend benefits to vest.”). Rather, the Yard-Man inference simply “requires ‘a nudge in favor of vesting’ in close CBA cases.” Moore, 690 F.3d at 450 (quoting Reese I, 574 F.3d at 321). In other words, under Yard-Man, in close cases, “[a] court may find vested rights ‘under a CBA even if the intent to vest has not been explicitly set out in the agreement.’ ” Noe v. PolyOne Corp., 520 F.3d 548, 552 (6th Cir.2008) (quoting Maurer, 212 F.3d at 915). However, this court has repeatedly held that, above all, the CBA’s language governs. Indeed, “[w]hen other contextual factors so indicate, Yard-Man simply provides another inference of intent. All that YardMan and subsequent cases instruct is that the Court should apply ordinary principles of contract interpretation.” Yolton, 435 F.3d at 580.
Additionally, this court has clarified that “[a]n employer that contractually obligates itself to provide vested healthcare benefits renders that promise ‘forever unalterable.’” Moore, 690 F.3d at 450 (quoting Sprague v. GMC, 133 F.3d 388, 400 (6th Cir.1998) (en banc)). A breach of a CBA creates a federal right of action under Section 301 of the LMRA, which prohibits “violation[s] of contracts between an employer and a labor organization representing employees.” 29 U.S.C. § 185(a). In such an instance, there is also a derivative ERISA violation. See Maurer, 212 F.3d at 914.
This brings us to the Reese cases. In Reese I, we drew a distinction between the vesting of retirement benefits and “the scope of those benefits” under the facts at issue in that case. 574 F.3d at 318. There, a CBA was entered into in 1971 and renewed periodically in substantially the same form until 1995 in which CNH (formerly Case Corporation) agreed to provide health insurance for retirees and their spouses. Id. In 1998, the parties entered into a new CBA which stated that:
Employees who retire under the Case Corporation Pension Plan for Hourly Paid Employees after 7/1/94, or their surviving spouses eligible to receive a spouse’s pension under the provisions of that Plan, shall be eligible for the Group benefits as described in the following paragraph.
Id. A letter of understanding about the cost of health care coverage supplemented the 1998 CBA which specified that Case/ CNH could “terminate a provider giving inadequate coverage and adopt a replace *553 ment plan that will provide comparable benefits and access to the type of plan it replaces.” Id. at 319 (quotation marks and brackets omitted). In 2004, retirees sued, seeking, among other things, a declaration that they were entitled to lifetime health care benefits. Id. The district court entered judgment in favor of the retirees, and CNH appealed. Id.
On appeal, this court explained that the issues presented were: (1) “[d]id the employees’ right to lifetime health-care benefits vest upon retirementf?]” and (2) “[wjhat does vesting mean in this context?” Id. at 322, 324. As for the first question, the court concluded that the rights did vest, and that therefore retiree health care could not be “unilateral[ly] ... terminate^].” Id. at 323.
Turning to the second question — the scope of the benefits — our court concluded that the benefits could be “reasonably alter[ed]” unilaterally by CNH. Id. at 327. Consistent with this court’s precedent, the Reese I court relied on the CBA’s language and extrinsic evidence — the parties’ conduct — in reaching its conclusion. The court explained:
no party to this case — the union, the employer, the retirees — viewed the benefits [as unalterable]. The 1998 CBA not only set the rules for employees who retired during the next six years of that CBA; it also reset the rules for employees who retired after July 1, 1994, which is inconsistent with the notion that the 1990 and 1995 CBAs ... created unalterable, irreducible health benefits. The 1994-1998 retirees were not asked to consent to this change, and they did not consent to it.
Id. at 324. We also noted that, despite the fact that the 1998 CBA “reset the rules” for the 1995-1998 retirees in a way that actually hurt those retirees, they never complained about the changes. The court further reasoned that the letter of understanding, which circulated contemporaneously with the 1998 CBA, “show[ed] that the parties ... contemplated replacing some managed care providers with others at some point in the future.” Id. at 325. We reasoned that the letter of understanding was an indication that the parties had contemplated
the realities of managed care, in which a new plan may fail to cover providers or services that an old plan had covered, such that the retirees had no basis for assuming that each replacement plan would at best improve, or at worst precisely maintain, the level of care provided to each individual retiree.
Id. at 325-26. Ultimately, this court remanded to the district court. This court wrote:
CNH, in short, cannot terminate all health-care benefits for retirees, but it may reasonably alter them. With this guidance, we leave it to the district court to decide how and in what circumstances CNH may alter such benefits-and to decide whether it is a matter amenable to judgment as a matter of law or not.
Id. at 327.
Three years later, Reese returned to this court after remand. In Reese II, 694 F.3d at 683-85, this court noted — as it did in Reese I — that the evidence, both from the CBA and from the parties’ conduct, indicated that the parties contemplated an evolving health care delivery system and that the scope of the vested health care benefit could change in light of that agreement. Id. at 683-85. Concluding that the district court on remand had failed to answer the second question from Reese I (what does vesting mean in this context?), the court again remanded the case to the district court, this time with a set of specific factors to guide the district court in its determination as to what would constitute *554 a “reasonable” alteration in health care benefits in that case. Id. at 685-86.
Underpinning many of defendants’ arguments on appeal is a characterization of the Reese cases as a major sea-change in Sixth Circuit retiree benefits case law. See Defendants’ Reply Br. at 2 (claiming that “Reese II represented a significant change” in the Yard-Man line of cases; see also Defendants’ Brief at 38-44; 44-47). Specifically, defendants characterize Reese’s conclusion that CNH could unilaterally alter the retirees’ health care benefits to mean that all CBAs in the Sixth Circuit are always unilaterally alterable, regardless of a CBA’s specific language. For example, defendants claim that Reese II “stated that, as a matter of law, an employer can make reasonable changes to retiree health insurance” once the right has vested. Defendants’ Br. at 38.
We disagree with defendants and reject their interpretation of the Reese cases. Contrary to defendants’ characterization, the Reese decisions are not a “significant change” in Sixth Circuit case law, but are entirely consistent with other Sixth Circuit retiree benefits cases insofar as the Reese courts simply examined the language of the CBA and the parties’ conduct in reaching their conclusions. See Yard-Man, 716 F.2d at 1479 (the plain language of the contract is the first place to look when discerning the parties’ intent); id. at 1479-80 (courts can look to extrinsic evidence to discern the parties’ intent); see also Moore, 690 F.3d at 451. (same); Cole, 549 F.3d at 1069-70 (same).
In other words, the Reese cases simply did what “Yard-Man and subsequent cases instruct[,]” which is to “apply ordinary principles of contract interpretation” to CBAs. Yolton, 435 F.3d at 580; see also Yard-Man, 716 F.2d at 1479. Specifically, the Reese courts based their analysis on, among other things: (1) the fact that the language of the 1998 CBA purported to retroactively change the benefits structure for workers who had retired prior to 1998; (2) the letter of understanding sent out contemporaneously with the 1998 CBA; and (3) the absence of any other contemporaneous evidence that might lead to a contrary conclusion. Indeed, a thorough reading of Reese reveals that each Reese opinion takes pains to repeatedly ground its rationale in the language and conduct of the parties. In sum, the Reese courts concluded that there, the scope of the vested right to health care could be unilaterally altered because that is what the evidence indicated the parties intended in that case, not because all vested health care rights in all CBAs are subject to unilateral alteration as a matter of law.
C.
Having clarified the role of the Reese cases among the rest of our retiree benefits case law, we now turn to the primary issue in this case: What did the parties in this case intend with regard to retiree health care benefits?
To discern the parties’ intent, we start — as our case law instructs — with the “explicit language of [the CBA.]” YardMan, 716 F.2d at 1479. Under the CBAs at issue here, Kelsey-Hayes agreed to include certain medical services in their employees’ health care coverages. Article III, Section 5(a) of the CBAs provided that, once an employee retired, Kelsey-Hayes promised the now-retiree the “continuance” of “[t]he healthcare coverages [that he or she] ha[d] ... at the time of retirement.” And, Kelsey-Hayes agreed to pay the “full premium or subscription charge for health care coverages continued in accordance with Article III, Section 5” for retirees. We find this language unambiguous and hold that this CBA language alone, when construed in light of the Yard *555 Man inference, created a vested lifetime right to health care benefits.
We also hold that the unilateral implementation of the HRAs breached the CBAs, not because HRAs are “unreasonable” under the Reese cases, but because the HRAs are simply not what the parties bargained for in the first instance. Again, upon the commencement of their retirement, plaintiffs were entitled to the continuation of the same coverages they had as employees. Upon retirement, they all had company-provided group health insurance coverage, with Kelsey-Hayes paying the full premium for that insurance. The HRAs are not company-provided group insurance; they are health care vouchers— essentially cash. According to Kelsey-Hayes’ own representatives, far from the company paying the full premium, the HRAs shift significant risks, including the potential costs of medical care, from the company to plaintiffs. Moreover, not only did defendants refuse to fund the HRAs past 2013, they failed to even acknowledge that the right to health care was vested in the first place;[1] the pamphlet sent to plaintiffs about the HRAs indicated that, so far as TRW was concerned, the HRAs were not vested and could be terminated at any time. For these reasons, we conclude that the implementation of the HRAs violated the CBAs. See Moore, 690 F.3d at 450 (“An employer that contractually obligates itself to provide vested healthcare benefits renders that promise ‘forever unalterable.’ ” (quoting Sprague v. GMC, 133 F.3d at 400)).
Plaintiffs make much of the “mutual agreement clause” in Article I, Section 1 of the CBAs’ health care supplement. That clause provides that in the event that “the initiation of any [health care] benefit or benefits ... does not prove practicable or is not permitted by the plans under which coverages are providedf,]” those coverages may be replaced with “new benefits or coverages as closely related as possible and of equivalent value” to those they replace; however, such a change can only be made with the agreement of the union. Plaintiffs argue that this clause is dispositive as to whether defendants could unilaterally implement the HRAs. We acknowledge that case law from this circuit has relied, to varying degrees, on the presence or absence of similar “mutual agreement” language. See, e.g., Moore, 690 F.3d at 459 (“By offering vested healthcare coverage to the retired employees ... and by agreeing that the CBAs could only be modified on the signed, mutual consent of the parties, Defendant waived its ability to unilaterally alter ... Plaintiffs’ healthcare coverage.”); Reese I, 574 F.3d at 326 (the CBA there “unless it says otherwise” should be construed to permit unilateral modification); Prater v. Ohio Educ. Ass’n, 505 F.3d 437, 444 (6th Cir.2007) (“When a contract contains formal procedures requiring mutual, written assent to amend, that language preempts future unilateral termination of rights.”). However, this court has squarely held that
[a]s a general rule, an existing contract cannot be unilaterally modified. Were it otherwise, the option of either party to modify a contract unilaterally would defeat the essential purpose of reaching an agreement in the first place — to bind the parties prospectively.... This principle *556 applies with equal force to collective-bargaining agreements, where employers are statutorily barred from effectuating unilateral modifications of existing collective bargaining agreements.
Prater, 505 F.3d at 443 (citations, quotation marks, and alterations omitted). Here, the mutual agreement clause simply reiterates this basic principle of contract interpretation. Accordingly, although the mutual agreement clause provides an additional piece of evidence that defendants could not unilaterally modify the CBAs by implementing the HRAs, we need not rely on the mutual agreement clause to reach that conclusion. We would reach the same result regardless of the presence of the mutual agreement clause.
However, although we need not rely on it to conclude that defendants could not unilaterally implement the HRAs, the mutual agreement clause is useful to our analysis in a different way. The mutual agreement clause stipulates that, in the event that replacement benefits are agreed upon, those replacement benefits must be “as closely related as possible and of equivalent value” to those originally provided. By including this language in the CBAs, the parties have removed any doubt not only that they intended that the right to retirement health care vest, but that they intended a particular kind of coverage to vest (namely, the type of coverage the employee had upon the commencement of his or her retirement, per Article III, Section 5(a)). Our approach in examining the mutual agreement clause for evidence of the parties’ intent with regard to other CBA provisions is consistent with YardMan, which instructed that “[t]he intended meaning of even the most explicit language can ... only be understood in light of the context which gave rise to its inclusion.” Yard-Man, 716 F.2d at 1479.
For these reasons, we disagree with defendants that the result warranted here is the same as the one in the Reese cases. To that end, we note that this case is factually different from the Reese cases as well. First, it was critical to the Reese I court that the 1998 CBA there “reset the rules” for employees who had retired under the previous CBA. Reese I, 574 F.3d at 324. By contrast, here, there was no resetting of the rules — each CBA here contained identical language to its predecessor with regard to retiree health care benefits. Unlike in the Reese cases, the parties here were playing by the same set of rules all along. Second, unlike in Reese — where the plaintiffs waited six years to sue — plaintiffs here did not wait idly by to take action; as soon as they received notice of defendants’ intent to implement the HRAs, plaintiffs sued. Third, unlike in Reese, where CNH simply “replac[ed] some managed care providers with others,” id. at 325, the HRAs not only were not what was bargained for (in that they are vouchers, not group coverage), but the HRAs also shifted the risk of excess cost from defendants to plaintiffs. Indeed, this case contains none of the indicia of intent present in Reese that led those courts to conclude that the parties intended for the health care benefits to be unilaterally modifiable.
In sum, we conclude that the CBAs established a vested right to lifetime health care benefits, and that the unilateral implementation of the HRAs breached the CBAs.
Defendants raise a number of arguments as to why the implementation of the HRAs was permissible. None has merit.
First, defendants argue that the coverage the HRAs provided to employees is better for the retirees than the group coverages they replaced. Defendants made some version of this argument in both *557 their brief on appeal and at oral argument. More specifically, defendants point to the fact that under the HRAs, retirees can pick from a variety of plans to meet the retirees’ individualized needs. Defendants also argue that, based on their own internal accounting, the average amount a retiree spent per year on health care costs was $3,000, and the HRAs are funded well in excess of that amount.
We find defendants’ claim that the HRAs will provide better coverage than the prior group coverages dubious. First, as noted above, defendants have refused to commit to continue funding the HRAs beyond two years. Second, it does not follow that no retirees will in the future exceed the level of HRA funding simply because no retiree has done so in the past. The cost of health insurance premiums increases every year, and this growth shows no signs of slowing. See, e.g., Susan Adler Channick, Health Care Cost Containment: No Longer an Option But a Mandate, 13 Nev. L.J. 792, 794-95 (2013) (“A new study by the Kaiser Family Foundation that tracks employer-sponsored health insurance shows the average annual premium for family coverage in 2011 reached $15,073, an increase of nine percent over the previous year. The study indicates that the cost of family coverage has almost doubled in just one decade. As private insurers raise premium rates to meet the projected costs of health care, the burden of rising premiums falls on employers who often shift the rise in costs to employees. It is projected that rising private health insurance. premiums will have an adverse effect on wage growth as well as the standard of living that individuals will be able to afford.”). Under the HRAs, if — or, more likely, when — the cost of a retiree’s annual health insurance exceeds the amount of money in his or her HRA, the retiree would be forced to incur the excess. By defendants’ own admission, this was not the case under the prior group coverages. Accordingly, we are skeptical of defendants’ claims that the HRAs provide better coverage for the retirees than did their previous health care coverages.
In any event, whether the HRAs are “better” or “worse” than the prior group coverages is immaterial as a legal matter. As described above, the HRAs were simply not what was collectively bargained.[2] The parties agreed in the CBAs that the retirees would get the same type of coverage they had upon retirement, which in the case of these retirees was group coverages with the full premium paid by the company.
Next, defendants argue that because plaintiffs did not sue when the group coverages were replaced with new group coverages — for example, when Blue Cross Blue Shield of Michigan was replaced with Meritan, and later when Meritan was replaced with Humana — plaintiffs have assented to unilateral changes and have waived their ability to challenge the HRAs. We disagree. Unlike the HRAs, the prior changes in group coverage did not violate the CBAs — in each case one group plan was replaced with another, with the company paying the full premium.
Defendants also argue that Article III, Section 1, Subsection (h) of the health care supplement unambiguously gives defendants the right to unilaterally modify plaintiffs’ retirement benefits. That subsection states that “[i]f in its judgment the Company considers it advisable in the in *558 terest of the employees, another arrangement may be substituted for all or part of the coverages” described in the supplement. We disagree with defendants’ interpretation of Subsection(h). Subsection (h), by its plain language, applies only to “employees.” Under -the plain text of the CBAs, an employee is a “person regularly employed on a full time basis ... by the Company on an hourly-rate basis.... ” A provision that clearly applies only to current employees is immaterial to a determination regarding retirees’ health care.
One more issue remains regarding the district court’s grant of summary judgment. Defendants argue that because the TRW defendants were not parties to the CBAs, they are improper defendants and that, therefore, summary judgment in favor of plaintiffs was improper “on this basis alone.” We disagree.
Initially,' we note that defendants have not cited any legal authority in support of their position on this issue, despite simultaneously asserting that this issue is dis-positive. Nor do defendants point to any record evidence in support of their position. Instead, defendants merely refer to plaintiffs’ evidence and assert that it is deficient. For these reasons, defendants have arguably forfeited appellate review of this issue. Langley v. DaimlerChrysler Corp., 502 F.3d 475, 483 (6th Cir.2007) (where a party only addresses issues “in a perfunctory manner,” it waives its arguments on those issues). Even assuming, however, that defendants have not waived this issue, their argument is unpersuasive.
Generally, a successor corporation is not liable for its predecessors’ liabilities unless expressly assumed. Yolton, 435 F.3d at 586 (citing NLRB v. Burns Int’l Sec. Servs., 406 U.S. 272, 279, 286-88, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972)). However, this rule is “not absolute ... as the [Supreme] Court has held that a CBA might remain in force ‘in a variety of circumstances involving a merger, stock acquisition, reorganization or assets purchase.’ ” Id. (quoting NLRB, 406 U.S. at 291, 92 S.Ct. 1571). To determine whether a successor corporation is responsible for its predecessors’ liabilities, courts examine “whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership.” Nelson Electric v. NLRB, 638 F.2d 965, 968 (6th Cir. 1981). This analysis is “flexible,” and “no one element” is itself dispositive; rather, “all the relevant factors must be considered together.” NLRB v. Allcoast Transfer, Inc., 780 F.2d 576, 579 (6th Cir.1986).
Plaintiffs have introduced sufficient evidence that TRW is liable for Kelsey-Hayes’ obligations. Specifically, plaintiffs have introduced the following evidence: (1) Iacobelli testified that Kelsey-Hayes was acquired by TRW in 2003, at which point Kelsey-Hayes “became TRW,” and that the term “the company” was properly understood to “encompass both Kelsey-Hayes and TRW[;]” (2) open-enrollment documents for the 2011 enrollment season sent to Jackson retirees explained that Jackson retirees were covered under a “TRW Automotive provided medical plan[;]” (3) TRW, and not its Kelsey-Hayes subsidiary, implemented the HRAs, and in the pamphlet sent to retirees, it was TRW, and not Kelsey-Hayes, that reserved the right to modify benefits under the new HRAs; and (4) the colleetivelybargained-for 2005 plant shutdown agreement named “Kelsey-Hayes (TRW)” as a party, drawing no distinction between the two entities.
Accordingly, defendants’ position that Kelsey-Hayes had merely a “bookkeeping” relationship with TRW is belied by the evidence. The TRW defendants are proper parties to this litigation.
*559 III.
Having resolved the issues relevant to the district court’s grant of summary judgment, we turn to its grant of a permanent injunction.
When evaluating a district court’s grant of a permanent injunction, this court reviews the district court’s factual findings for clear error and its legal conclusions de novo. Women’s Med. Prof'l Corp. v. Baird, 438 F.3d 595, 602 (6th Cir.2006) (citations omitted). However, “[t]he scope of injunctive relief is reviewed under an abuse of discretion standard.” Id.
The Supreme Court has held that a plaintiff seeking a permanent injunction must “satisfy a four-factor test[.]” eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). Specifically,
[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.
Id. We conclude that plaintiffs have satisfied these factors. Ultimately, compensating plaintiffs monetarily will not remedy the breaches of the CBAs — rather, the appropriate remedy is to require defendants to do what they agreed to do in the CBAs. This is all the injunction requires.
Defendants raise two arguments in opposition to the permanent injunction. Neither has merit. First, defendants argue that “to the extent the District Court’s injunction order requires coverage for any of the expenses not expressly described in ... Article III § 1 [of the health care supplement to the CBAs], it was in error.” We disagree. As described above, the parties intended to create a vested right to lifetime health care for the retirees within the strictures established by the CBAs in terms of coverage (i.e. group coverage, with defendants paying the full premium). All the injunction requires is performance consistent with the plain text of the CBA; indeed, by its very terms, the injunction simply requires a return to the “status quo ante.” Contrary to defendants’ argument, we do not interpret the injunction as requiring any more than was already required by the plain text of the CBAs. Accordingly, remand is unnecessary.
Second, defendants argue that the permanent injunction should be rewritten to specifically instruct that future changes to retiree health care benefits are permissible with the consent of both parties. Again, this is a condition already clearly spelled out in the CBAs. Accordingly, a remand to include what is already unambiguously contained in the CBAs is unnecessary.
IV.
Finally, defendants challenge the district court’s award of attorney fees to plaintiffs.
This court reviews a district court’s award of attorney fees and expenses for abuse of discretion. Geier v. Sundquist, 372 F.3d 784, 789 (6th Cir. 2004) (citing Perotti v. Seiter, 935 F.2d 761, 763 (6th Cir.1991)). “An abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment.” Harlamert v. World Finer Foods, Inc., 489 F.3d 767, 773 (6th Cir.2007) (quotation marks omitted).
Ultimately, an attorney fee award must be “reasonable.” Adcock-Ladd v. Sec’y of Treasury, 227 F.3d 343, 349 (6th Cir.2000). To determine a rea *560 sonable fee award, the district court looks at “the proven number of hours reasonably expended on the case by an attorney, multiplied by his court-ascertained reasonable hourly rate.” Id. This court uses the “lodestar” approach to determine the reasonableness of attorney fees. Barnes v. Cincinnati 401 F.3d 729, 745 (6th Cir. 2005). Under that approach, the reasonableness of hours and the lawyer’s rate are determined by considering the following factors:
(1) time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time and limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the “undesirability” of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in “similar cases.”
Isabel v. City of Memphis, 404 F.3d 404, 415 (6th Cir.2005) (citations omitted).
Here, in the district court, defendants did not argue that plaintiffs’ counsel’s hourly rate was excessive, opting instead to focus on the number of hours worked. The district court agreed with defendants that the number of hours claimed by plaintiffs’ counsel was unreasonably excessive and imposed an across-the-board reduction in the number of hours by 10%. See Auto Alliance Intern., Inc. v. U.S. Customs Serv., 155 Fed.Appx. 226, 228 (6th Cir. 2005) (“This Court has recognized the propriety of an across the board reduction based on excessive or duplicative hours.”) (citing Coulter v. Tennessee, 805 F.2d 146, 151 (6th Cir.1986)). Defendants’ argument on appeal is that the district court did not reduce the number of hours enough. In light of our deferential standard of review, we cannot agree.
Ultimately, defendants’ assertion as to what constitutes a reasonable number of hours is itself arbitrary. For example, defendants argue that plaintiffs’ cited 353.25 hours spent briefing for summary judgment should be reduced to 75. However, defendants offer no evidence that plaintiffs’ counsel spent only 75 hours briefing for summary judgment, nor do they offer any reason why 75 hours is a reasonable amount of time for such a complex case. Accordingly, defendants have left us no reason to question the district court’s award, particularly in light of the highly deferential standard of review. Indeed, ultimately,
[t]he trial court’s exercise of discretion [in an attorney fee case] is entitled to substantial deference because the rationale for the award is predominantly fact driven. This deference is appropriate in view of the district court’s superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters.
Imwalle v. Reliance Med. Prod., Inc., 515 F.3d 531, 551 (6th Cir.2008) (citations and quotation marks omitted). Finding no abuse of discretion, we affirm the'district court’s attorney fee award.
V.
For these reasons, we affirm the judgment of the district court.

. Defendants have apparently changed their position on this point. In their briefs on appeal, defendants appeared to concede that the right to health care vested, but argued that the district court should be reversed because HRAs were reasonable modifications of the existing health care structure under the Reese cases. At oral argument, however, defendants' counsel refused to concede that the right to health care vested in the first place, despite repeated questioning on the subject.

. For this reason, to the extent that this opinion relies on the potential cost-shifting features of the HRAs, the fact that the retirees had group coverages upon retirement, etc., we do so to illustrate that the HRA structure is different from what the parties intended, not to opine about the relative quality of the HRAs compared to the prior group coverages.