DUNLAP LUMBER CO. v. NASHVILLE, C. & ST. L. RY. CO.*

(*Nashville.* December Term, 1913.)

1. **RAILROADS. Switching services. Right to discontinue.**

  If a shipper denies his liability for demurrage, the railroad company cannot discontinue its switching services on account of the nonpayment of demurrage. (*Post, pp.* 173-175.)

  Case cited and distinguished: Yazoo & M. V. R. Co. v. Searles, 85 Miss., 520.

2. **CARRIERS. Freight. Demurrage.**

  If a railroad company knew that a shipper would not accept logs in cars placed on a certain track, before the cars were delivered there, the shipper could not be charged with demurrage for not receiving the cars at that point. (*Post, p.* 175.)

  Case cited and approved: Railroad v. Hunt, 83 Tenn., 261.

3. **CARRIERS. Freight. Point of delivery.**

  It is implied in a contract for the shipment of logs that they shall be delivered at a point enabling the shipper to receive without delay or inconvenience. (*Post, pp.* 175, 176.)

  Case cited and approved: Railroad v. Hunt, supra.

4. **TROVER AND CONVERSION. Conversion by carrier.**

  The sale of logs shipped by a railroad company for demurrage when the freight charges due had been paid, so that no demurrage was chargeable, was a conversion of the logs by the company. (*Post, p.* 176.)

  Case cited and approved: M. & P. R. Co. v. Jacobson, 179 U. S., 287.

5. **CARRIERS. Freight. Facilities for shipment. Discrimination.**

  Since railroad companies are organized primarily for the public interest and convenience, a railroad company cannot arbitrarily prevent the use by a shipper of the instrumentalities of other

---

*On the question of discrimination by carrier as to delivery of freight, see note in 12 L. R. A. (N. S.), 510. And upon the duty of a carrier to deliver car at consignee's place of business, see note in 41 L. R. A. (N. S.), 678.

roads beyond its own lines which it has acquired the right to use. (*Post, p.* 176.)

Cases cited and approved: Post v. Railroad, 103 Tenn., 202; M. P. R. Co. v. Larabee Flour Mills Co., 211 U. S., 614.

6. **CARRIERS. Freight. Discrimination against shippers.**

It is the common law duty of a railroad company to serve the public without discrimination in service or charges. (*Post, pp.* 177, 178.)

7. **COMMERCE. Interstate commerce—State regulation.**

While the State courts cannot directly interfere with interstate transportation, by regulating its conveniences or charges, they may control intrastate transportation, and the fact that a railroad company carries interstate freight, would not deprive the State courts of jurisdiction to compel it to switch cars for a shipper on an industrial siding. (*Post, pp.* 178, 179.)

Case cited and approved: M. P. R. Co. v. Larabee Flour Mills Co., supra.

8. **CARRIERS. Freight. Common-Law duties. Discrimination.**

Acts 1897, ch. 10, secs. 15, 17, prohibiting carriers from discriminating as to charges or services or from giving any unreasonable preferences, are merely declaratory of the common law. (*Post, pp.* 179, 180.)

9. **RAILROADS. Freight. Performance of duties. Remedy.**

Injunction is the proper remedy to compel a railroad company to deliver to a shipper on a spur track the freight shipped to it, where it appears that the discontinuance of switching services to the shipper would be destructive of its business; the legal remedy being inadequate. (*Post, pp.* 180, 181.)

10. **RAILROADS. Freight. Remedy of shipper. Injunction.**

In a suit to compel a railroad company to switch cars shipped to complainant on its industrial siding, the injunction issued was properly framed so as to require the company to receive and deliver to complainant on its spur track all freight, etc., according to complainant's reasonable needs and consistent with the company's duties to other shippers it was required to serve. (*Post, p.* ——.)

FROM DAVIDSON.

Appeal from the Chancery Court of Davidson County to the Court of Civil Appeals and by *certiorari* from the Court of Civil Appeals to the Supreme Court.— JOHN ALLISON, Chancellor.

PENDLETON & DE WITT, for plaintiff.

FRANK SLEMONS and CLAUD WALLER, for defendant.

MR. JUSTICE LANSDEN delivered the opinion of the Court.

This bill was filed by the complainant against the defendant railway to compel it to perform certain switching operations for the complainant and to recover in trover the value of four carloads of logs. The complainant sought a mandatory injunction commanding the defendant to deliver logs and merchandise in carload lots to its private track adjacent to its mill. The defendant answered the bill and denied its obligation to perform the switching operations demanded by complainant, and denied its liability for the value of the four carloads of logs sued for, and filed a crossbill by which it sought to recover $4 alleged to be due it from complainant as demurrage upon two certain cars which it claimed the complainant had held out of service longer than the rules of the Traffic Association permitted.

The chancellor granted the relief prayed for, except that he imposed, as a condition precedent to the defendant's switching operations, that the complainant should be required to unload all cars which were standing on the switch track belonging to it. From this part of the chancellor's decree the complainant appealed to the court of civil appeals, and from the other parts the railway appealed. The court of civil appeals affirmed the decree of the chancellor in all respects, except that it allowed the railway a recovery under its crossbill for the demurrage claimed, and it modified the decree of the chancellor in so far as he undertook to determine the hours of the day and the number of times each day that the railway should be required to perform switching services for the complainant; that court decreeing in general terms that the railway should be required and commanded to receive, transport, and deliver to complainant on its spur track at its mill all carloads of logs and merchandise to a just and equal extent, according to complainant's reasonable needs and consistently with the railway's duties to other industries which it was obligated to serve. Both parties have filed petitions for *certiorari* to the decree of the court of civil appeals and have assigned errors. The complainant insists that that court erred in requiring it to unload all cars which were placed upon its track east of Wall street before defendant is required to remove any of the cars which have been placed at that point for unloading, and that it was error for that court to give the railway com-

pany a decree for the demurrage claimed, and to tax complainant with any part of the costs.

The railway company complains at that part of the decree of the court of civil appeals which requires it to perform the switching operations demanded by complainant, and which awarded the complainant a recovery for the value of the four carloads of logs, and adjudged costs against it. The material facts necessary to be stated are as follows:

Many years ago the Louisville & Nashville Railroad Company constructed a spur track along Front street in the city of Nashville, connecting with its main line, and extending to within 500 feet of the present site of complainant's mill. The complainant operates a sawmill, and saws logs for itself and for other dealers and users of lumber, and requires in its business about four carloads of logs daily. It caused a sidetrack to be constructed connecting its millyard with the spur track of the Louisville & Nashville Railroad just referred to. This sidetrack is built upon a sharp curve so as to describe approximately a semicircle, and is about 480 feet in length. It will accommodate at one time about twelve cars of the length of cars usually employed by defendant in hauling logs. This sidetrack of complainant crosses a street known as Wall, or Mill, street, and is intersected by Wall street at a point about equidistant between the terminus of the sidetrack at the millyard and the intersection of the spur track with the Louisville & Nashville Railroad. When the sidetrack is filled with cars, there will be

about six cars west of Wall street. For a consider-
able period of time prior to the filing of the bill, com-
plainant demanded that the defendant switch the cars
on its sidetrack about twice every day. This was
deemed necessary by the complainant because it was
convenient for it to unload only two cars at a time. Its
millyard was so constructed that more than two cars
could not be conveniently and economically handled
at a time in the operation of its mill. When two cars
would be unloaded, the complainant would demand
that the defendant switch these cars out and place in
their room two other cars. This switching operation
made it necessary for the defendant to move all of
the cars on the sidetrack onto the spur track, switch
out the empty cars, and replace the loaded cars at the
millyard where the empties had been, and place other
loaded cars on the sidetrack. The defendant ac-
quiesced in this mode of operation for a considerable
period of time before the filing of the bill. In May,
1909, the defendant received two cars consigned to the
complainant, and after weighing them and holding
them in its yards for probably two days, it transported
them along the spur track, and tendered them to the
complainant on its sidetrack. These two cars were
tendered on different days, and, at the time each car
was tendered, the complainant was not in a position
to receive it because its sidetrack was occupied by
other loaded cars.

The various railroads entering the city of Nash-
ville have formed what is called the Nashville De-

murrage & Storage Bureau. This bureau was placed
in charge of a manager, and it was his duty to see that
each railroad charged each shipper the proper amount
of demurrage due on cars, and to see that each shipper
paid the demurrage due, and to adjust any differences
that might arise between shippers and the railroads
concerning demurrage. It was the practice of the De-
murrage Bureau not to require shippers to pay de-
murrage upon delivery of cars, but delivery was made
and accounts for the demurrage were rendered ship-
pers and collected by the bureau. One of the rules of
the Demurrage Bureau is a follows:

"In case consignee or consignor shall refuse to pay
or unnecessarily defer the settlement of bills for de-
murrage charges, which have accrued upon private
or specially designated tracks, the agent, after notice
to such consignee or consignor, shall refuse to switch
future cars to such private or specially designated
tracks, but will make deliveries only from the rail-
road's public delivery tracks until such charges have
been paid."

Another rule of the Demurrage Bureau is as fol-
lows:

"When delivery of cars consigned or ordered to
private tracks cannot be made on account of inability
of consignee to receive, delivery will be considered to
have been made when the car was tendered. The
agents must give written notice for all cars which they
have been unable to deliver because of the condition of
the private track or because of other conditions attri-

butable to consignee. This shall be considered constructive placement.''

Under the authority conferred by the foregoing rules; the defendant demanded of complainant $6 demurrage on the two cars last referred to. A controversy arose about the matter, and it was finally referred to the manager of the Demurrage Bureau, who reduced the claim of the defendant to $4. This payment was demanded by defendant and was refused by complainant. The complainant took the position in respect of the demurrage that the free time allowed it for the use of cars did not begin to run until the cars were delivered on the switch track, and therefore it was not chargeable with demurrage for the time that the cars in question remained on the spur track. Soon thereafter the defendant gave notice to the complainant in conformity with the rules of the bureau that it would not deliver any more loaded cars of logs upon complainant's private track, but that it would make delivery of such cars at its general delivery tracks. Subsequently four cars of logs were shipped from Camden, Tenn., consigned to the complainant at Nashville. These cars arrived in Nashville over defendant's road and were delivered at its general delivery tracks. The complainant was notified of this fact and paid the freight charges on the four cars of logs and demanded that they be delivered on its private track. This the defendant declined to do, and the complainant declined to receive the logs. Defendant unloaded them at its team track, and they

lay on the ground for a number of months, when defendant sold them to enforce a claimed lien for accrued demurrage while standing at the team track and because the logs were deteriorating.

The defendant railway has no line of road which connects with the sidetrack of the complainants. Its line of road, however, does connect physically with the line of the Louisville & Nashville Railroad and the lines of the Louisville & Nashville Terminal Company, and they conect with complainant's switch track. This latter company owns a number of tracks upon and adjacent to a large number of streets in the city of Nashville and constitutes practically the terminal facilities of the Louisville & Nashville and Nashville & Camden Railway Company. The Nashville Terminals is a joint organization of the Louisville & Nashville Railroad and the Nashville, Chattanooga & St. Louis Railway, and has control over the terminal facilities of both of those roads and the Louisville & Nashville Terminal Company within certain prescribed limits, and including the spur track heretofore referred to where it connects with the complainant's sidetrack. The Louisville & Nashville Terminal Company has leased its property to the Louisville & Nashville Railroad and the Nashville, Chattanooga & St. Louis Railway. All of these terminal properties are maintained and operated for the benefit of the two principal railroads. Business received over either road is delivered to any private industrial track, whether such track belongs to private persons, or

whether it belongs to or is operated by either of the railroads, as if all of the tracks were owned jointly by both roads. The Nashville Terminal Company was designated by the two railroads as a convenient working arrangement between them for the handling of traffic coming into or going out of the city of Nashville, or passing through the city over the lines of either road. The defendant company makes delivery of freight in carload lots in Nashville through the agency of the Nashville Terminals, and, as stated, the arrangement is such that delivery can be made to any point in the city, regardless of whether the point of delivery is served by the defendant or by the Louisville & Nashville Railroad Company. In pursuance of the arrangement referred to, it has been the custom and course of dealing for some years prior to the filing of the bill for the defendant to deliver freight in carload lots to the complainant through the agency of the Nashville Terminals. These deliveries would be made upon general instructions received by the terminals, and, as a matter of course, arising from the business of the Nashville Terminals and the customary dealings of the defendant with the complainant and other shippers. No distinction is made in delivering cars on industrial tracks between cars destined to points on the line of the defendant and cars destined to points on the line of the Louisville & Nashville Railroad, whether such cars are shipped into Nashville over the lines of the defendant or over the lines of the Louisville & Nashville Railroad. The evidence does not indicate the ex-

act length of time that the arrangement referred to has been in force, nor any particular length of time which it is to remain in force. The proof is clear, however, that the arrangement exists, and there is nothing to indicate that it is to cease.

1. The reasonableness of the regulations of the Demurrage Bureau is not questioned by the complainant. As we have seen, the rules of that organization provide that a delivery upon the spur track shall be deemed a delivery to the consignee if the condition of the side-. track which serves the consignee is not such that carload lots can be delivered thereon. This being true, it is clear that the complainant was liable for the demurrage, and the decree of the court of civil appeals so adjudging is correct.

It does not follow, however, from this conclusion that the defendant railway was justified in suspending the switching service demanded by complainant on account of the dispute about the demurrage. Complainant is solvent, and any judgment which the railway might have recovered against it for the demurrage would have been good. We cannot say from the facts stated that the complainant's claim that it did not owe the demurrage was in bad faith. There is no direct proof to indicate a lack of good faith, and nothing upon the point except the facts out of which the controversy arose. We think therefore that if the complainant in good faith denied its liability for the demurrage that the railway company could not for that reason discontinue its switching services to the complainant. The·

point was expressly decided by the supreme court of Mississippi in *Yazoo & M. V. R. Co.* v. *Searles,* 85 Miss., 520, 37 South., 939, 68 L. R. A., 715, in which it was said:

"No carrier has the right, on acount alone of a dispute arising from a doubt as to the correctness of a particular bill or several bills for demurrage already past due, or an honest difference of opinion as to the justice of the charge on any number of cars already received and delivered, to refuse to 'switch and place' other cars subsequently received. No carrier can refuse its services to anyone desiring them on the ground alone of an adjusted claim then pending, or on account of any previous violation of contract by such person, no matter how flagrant and inexcusable, if such person, at the time the service is demanded, is legally entitled thereto."

The remedy adopted by the defendant railway to enforce the collection of its demurrage charges was unreasonable and destructive of the business of the complainant. If such action should be allowable, as a means of enforcing payment of disputed charges, the practical effect of it would necessarily be to prevent shippers from disputing items of charge with the carrier. The team track of the defendant to which it delivered logs consigned to the complainant after the controversy over the demurrage arose is more than a mile from complainant's mill, and for complainant to be compelled to receive logs at this point and transport

them in wagons to its mill would destroy its business. This is the undisputed evidence.

In addition, the defendant did not have any claim for demurrage upon the carloads of logs to be delivered to the team track, and therefore it had no lien upon these logs for any item of charge. The complainant paid the freight on these carloads in advance and demanded delivery to its switch track. The complainant accepted the freight, but declined to deliver the logs at the switch track and and delivered them at the team track. Later, and after the bill was filed in this case, the defendant sold the logs to enforce a claimed lien for demurrage accruing upon the cars while remaining at the team track. Plainly the defendant could not charge demurrage upon cars delivered at this point after the consignee had given notice, as in this case, that the shipment would not be received at the point of delivery. The defendant knew that the complainant would not accept the logs at the team track before the cars were delivered there, and of course complainant could not be charged demurrage for not receiving them at that point. *Railroad* v. *Hunt,* 15 Lea, 261.

We think, also, that the defendant was guilty of a conversion of the logs when it sold them. It was implied in the contract of shipment between complainant and defendant that the logs should be delivered at a point which would enable the complainant to receive them "without inconvenience, delay, or interruption." *Railroad Co.* v. *Hunt, supra.*

The freight having been paid, and there being no proper charges for demurrage, the sale of the logs by the railway company was gratuitous and unwarranted and clearly a conversion.

2. From the facts stated, it is made to appear that the defendant railway is equipped to deliver freight at the complainant's switch track, although it is beyond the terminus of the lines actually owned by it. The defendant has provided a means of such delivery to enable it to more effectually discharge its duty to the public as a carrier of freight and passengers. Railroad companies "are organized for the public interest and to subserve primarily the public good and convenience." *M. & P. R. Co.* v. *Jacobson,* 179 U. S., 287, 21 Sup. Ct., 115, 45 L. Ed., 194.

This law of their creation enters into and controls every facility of transportation which the railroad company acquires to aid it in the discharge of its duty to the public. Therefore, if it acquires the right to serve all of its patrons through the instrumentalities of other roads beyond the termini of its own lines, it cannot arbitrarily withhold such facilities from any shipper. Its duty to serve all shippers equally and alike upon the payment of proper and reasonable charges must extend to every right acquired by it in the lines of other roads for the purpose of aiding it in the general discharge of its duty to the public to the same extent and in the same degree as if the service were performed through its own instrumentalities. The right of every member of the public to receive

Lumber Co. v. Railroad.

equal service attaches to the right acquired by the carrier to render the service.

There is nothing in *Post* v. *Railroad,* 103 Tenn., 202, 52 S. W., 301, 55 L. R. A., 481, in conflict with the holding. It is true that it was held in that case that a railroad company cannot be required as a legal obligation to carry freights beyond its own terminal points. It is manifest, however, that the court was not speaking with reference to the title by which the railroad company held, or the degree of interest which it possessed in the terminal points referred to. It was speaking alone of a case in which the initial carrier had no right to use the termini under consideration. We cannot conceive that it could affect the duty of the carrier to deliver freight at points on terminals which it had a perfect right to use, whether it owned the terminals or not. The determinative point is the right of ingress and egress which the carrier has to and from the terminals upon which delivery is to be made. If it has such right, and has acquired the right in aid of the performance of its duty to the public as a common carrier, it must render the service to every member of the public in furtherance of its duty. *M. P. R. Co.* v. *Larabee Flour Mills Co.,* 211 U. S., 614, 29 Sup. Ct., 214, 53 L. Ed., 352.

The case last cited is direct authority for the doctrine that it is the common law duty of the defendant railway to serve the public equally and alike and without discrimination in service or charges by virtue alone

of the fact that it is a common carrier of freights and passengers. In fact, we do not understand that it is denied that such a duty rests upon the defendant railway. The point made is not that the railway does not owe the duty to serve the public in its capacity of a common carrier of freights and passengers, but that it has no line of road connecting with the complainant's switch track, and therefore it cannot be compelled to deliver freights beyond its own line. This contention cannot be sustained.

It is not shown in the evidence that the complainant receives freight, or has ever received freight, from the defendant's line of road at a point outside of this State, or that it ships the products of its mill to any point beyond the limits of this State. The only shipment that is shown in the proof is the shipment of the four car loads of logs from Camden, Tenn., to Nashville, Tenn.

There is a suggestion on the brief of counsel for the railway that inasmuch as it is an interstate road, and therefore necessarily engaged in interstate transportation, there is no jurisdiction in the State courts to grant the relief awarded by the court of civil appeals and the chancellor to the complainant. The suggestion seems to have been made for the first time in the court of civil appeals, and then later in this court. In the various disputes between the complainant and the Demurrage Bureau, and the officers of defendant railway, there seems to have been no suggestion of inconvenience to or interference with the duties

of the railway as a carrier of interstate freights. It is settled beyond dispute that the State courts cannot interfere directly with interstate transportation, either to regulate its conveniences or its charges. But it is also well settled that the State courts can control intrastate transportations of freight and passengers. The fact that a defendant is a carrier of interstate freights is not alone sufficient to oust the State courts of their jurisdiction to enforce the demand made in this case. Just how far the courts of a State may be authorized to go in regulating intrastate shipments when commingled with interstate shipments is not necessary for decision in this case. However, the *Mills Case,* supra, and the later case of *Grand Trunk Railroad Commission,* decided December 8, 1913, are very interesting cases upon this question. In the last case cited, it was held that the congress has not so taken over the whole subject of terminals, team tracks, switching tracks, siding, etc., of interstate railways as to invalidate all State regulations relative to the interchange of traffic.

By chapter 10, Acts of 1897, all discriminations between shippers by railroads is forbidden, and expressly made unlawful in this State. Jurisdiction of the punishment of violations of the act in criminal matters is directly conferred upon the circuit and criminal courts of the State, and jurisdiction of all suits of a civil nature arising under the act is conferred upon the chancery courts. By section 15, rebates, drawbacks, and all other devices by which railroads may charge,

demand, or collect a greater or less compensation for any service rendered in the transportation of property within this State than it charges from any other person for a like service is forbidden. And so, also, by the same section, are railroads prohibited to make any preference between shippers in "furnishing cars or motive power," and by section 17 it is made unlawful for any corporation "to make or give any undue or unreasonable preference or advantage to any particular person, . . . or any particular description of traffic, or to subject any particular person, company, firm, corporation or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage."

The sections of the statute just referred to are declaratory of the common law. They merely define the common law duty of public carriers to serve equally and alike all shippers who pay reasonable charges for services required and comply with the carriers' reasonable regulations to enable it to perform its functions as such.

We think, too, that the complainant's remedy is injunction. A discontinuance of the switching services required by it and a delivery of its logs at the team track of the defendant is shown by the proof to be destructive of the complainant's business. If it should be compelled to resort to an action for damages against the railway for its refusal to deliver logs at the complainant's switch track, such a course would result in a great multiplicity of suits, the accumulation of large

and unnecessary bills of costs, and judgments for damages in small amounts, the collection of which would be delayed to such periods that they would not aid the complainant in the operation of its mill like the profits it would receive in the orderly conduct of its business when logs are delivered at its yards. Being entitled to the service, it is entitled to earn and receive its profits. We think it clear therefore that the complainant's legal remedy is inadequate, and the only. relief fully adequate to compensate it in the premises is the remedy of injunction to compel the defendant to perform the services which complainant is entitled to demand. As to the nature of the injunction which should be awarded to complainant, we are content with the decree of the court of civil appeals. Defendant will pay the costs of this court.

. Affirmed.