# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### July 8, 2014 Session

## PAUL T. COLEMAN v. BILLIE A. BROWN ET AL.

### Appeal from the Chancery Court for Knox County
### No. 160496-1     John F. Weaver, Chancellor

---

### No. E2013-01544-COA-R3-CV - Filed October 10, 2014

---

In the present consolidated action, the plaintiff sought a determination from the trial court that he was the sole owner of a corporation and two limited partnerships based on the deaths of the other shareholders/partners. The trial court found that the plaintiff had failed, pursuant to the terms of the respective partnership agreements and the corporate buy-sell agreement, to assert his right to purchase the decedents' interests within a reasonable time after their deaths. The trial court concluded that the plaintiff had waived his right to purchase those interests and was barred from now asserting such claim. The plaintiff has appealed that ruling. We affirm the trial court's ruling regarding ownership of the corporate shares and partnership interests, although on different grounds. Determining that the corporate shares and partnerships interests are held by the personal representatives as assets of the decedents' estates, we modify the trial court's judgment to remove the designation of the personal representatives as assignees.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
### Affirmed as Modified; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and D. MICHAEL SWINEY, J., joined.

John A. Lucas, Knoxville, Tennessee, for the appellant, Paul T. Coleman.

Arthur G. Seymour, Jr., and Robert L. Kahn, Knoxville, Tennessee, for the appellees, Billie A. Brown, as co-personal representative of the estate of David G. Brown, and Jennifer J. Fowler, individually and as personal representative of the estate of John B. Fowler.

David T. Black, Maryville, Tennessee, for the appellee, Billie A. Brown, individually.

Thomas S. Scott, Jr., Knoxville, Tennessee, for the appellee, David G. Brown, Jr., individually and as co-personal representative of the estate of David G. Brown.

**OPINION**

I.  Factual and Procedural History

Eastowne Partners I, Ltd. ("Eastowne I") and Eastowne Partners II, Ltd. ("Eastowne II") are Tennessee limited partnerships formed in 1985.  Eastowne I was established with the intent of developing a retirement center on a 7.8-acre tract of land in Knoxville.  This development never occurred, but Eastowne I maintains ownership of the acreage.  Eastowne II was created for the purpose of developing an apartment complex on a nearby tract of land.  The apartment complex, Eastowne Village Apartments, was constructed and continues to be owned by Eastowne II.

Both limited partnerships initially were formed with two general partners, Eastowne Village, Inc. ("EVI") and First Tennessee Development Company, Inc.  Both partnerships also originally had four limited partners:  David G. Brown, John B. Fowler, Brown Ayres, and the plaintiff, Paul T. Coleman.  In 1988, Mr. Ayres sold his interests in both partnerships and his stock in EVI to Mr. Brown.  First Tennessee Development Company, Inc. subsequently withdrew as a general partner.  Thereafter, the ownership interests of each partnership were as follows:

| General Partner | | Limited Partners | |
|---|---|---|---|
| Eastowne Village, Inc. | 1.00% | David G. Brown | 49.50% |
| | | Paul T. Coleman | 24.75% |
| | | John B. Fowler | 24.75% |

Likewise, EVI's only shareholders were Mr. Brown (50%), Mr. Coleman (25%), and Mr. Fowler (25%).

Also in 1988, Eastowne II entered into a management agreement with Brown, Brown & West, a realty management company solely owned by David Brown.  This agreement provided that Brown, Brown & West would manage the Eastowne Village Apartments and collect rent in exchange for 4.5% of the monthly gross receipts.  Billie Brown, Mr. Brown's wife, worked for Brown, Brown & West as a property manager.

During the late 1990s, there occurred a "falling out" between Mr. Coleman and the other two limited partners, Mr. Brown and Mr. Fowler.  While the exact nature of their dispute is unclear, the record does contain a November 4, 1996 letter from Mr. Brown to Mr.

Coleman, which states in pertinent part:

> As managing partner, I have realized that you have not participated in the payment of expenses regarding the deficits, which in effect, is a violation of the partnership agreement; therefore, I must insist that you are no longer considered a partner, and that your ownership is now [moot].

On August 8, 2003, Mr. Coleman filed a complaint against EVI, Mr. Brown, and Mr. Fowler, alleging breach of fiduciary duty and other claims. In February 2004, Mr. Coleman filed three additional court actions against Mr. Brown, Mr. Fowler, EVI, Eastowne I, and Eastowne II. The initial action was voluntarily nonsuited without prejudice in 2005.

Mr. Brown died on June 23, 2006. Mr. Fowler died on July 5, 2006. Following their deaths, Mr. Coleman instituted another action against the estates of Mr. Brown and Mr. Fowler. Subsequently, in September 2010, Mr. Coleman filed a motion to consolidate the four pending cases. He also named as defendants Jennifer Fowler, Ms. Brown, and David Brown, Jr. As Ms. Brown continued doing business as Brown, Brown & West after her husband's death, she also continued managing the Eastowne Village Apartments. David Brown, Jr. is Mr. Brown's son and Mrs. Brown's stepson. Ms. Brown and Mr. Brown, Jr. are co-personal representatives of Mr. Brown's estate. Ms. Fowler is the surviving spouse of Mr. Fowler and the personal representative of his estate.

Upon considering the motion, the trial court granted approval for the pending matters to be consolidated. Mr. Coleman thereafter filed two amended and restated complaints, alleging, *inter alia*, claims of breach of fiduciary duty, breach of contract, conversion, and conspiracy. Mr. Coleman sought an accounting for all three business entities and a declaratory judgment that neither Ms. Fowler, Ms. Brown, nor Mr. Brown, Jr., were lawful partners, shareholders, or directors. The trial court later granted a joint motion for an evidentiary hearing to determine the shareholders of EVI and the partners of Eastowne I and II.

At trial, Mr. Coleman claimed that he was the sole remaining shareholder of EVI pursuant to the terms of the corporate buy-sell agreement. He further asserted that he was the sole remaining limited partner in both Eastowne I and II pursuant to the terms of the limited partnership agreements. Concerning these issues, the trial court noted:

> The motivation for the dispute over the ownership of the corporate general partner and the limited partnerships is attributable to the grave difference between book value or a capital account and market value. *See* 7 Tenn. Jur., *Corporations*, § 18 *et seq.* (2012). ("Capital stock is clearly not the

same as the property possessed by the corporation, for the capital stock remains fixed, although the actual property of the corporation varies in value, and constantly increasing or diminishing in amount."); 20 Tenn. Jur., *Partnerships*, § 11 *et seq*. (2012). ("The capital of a partnership is not therefore the same as its property.").

The plaintiff argues that he [is] entitled to the stock of the deceased shareholders under the buy sell agreement as determined by a function of book value resulting in a negative price for the shares. The plaintiff argues that the limited partnerships are entitled to the limited partnership interests of the deceased limited partners as determined by a function of their capital accounts resulting in a negative price for their interests. For the purpose of this opinion, the price of the shares will be addressed in the terms of book value and the price for limited partnership interests will be addressed in the terms of capital accounts. If the plaintiff is successful on his arguments that he is entitled to the stock, at book value, of the deceased shareholders in the corporate general partnership and that the limited partnerships are entitled to liquidate the limited partnership interests of the deceased limited partners at the amount of their capital accounts, then the plaintiff may gain all of the value of the assets in the corporate general partner and the limited partnerships with no additional outlay. Ownership of all the stock in the general corporate partner also gives the owner control of the general corporate partner which, in turn, has control of the management and affairs of the limited partnerships. On the one hand, the plaintiff contends that he is entitled to the benefit of his bargains as evidenced by the stockholders' buy sell agreement and limited partnership agreements. On the other hand, the defendants argue that the plaintiff is misinterpreting the agreements and that the plaintiff has waived his rights under the agreements to acquire the deceased stockholders' stock and to obtain liquidation of their limited partnership interests.

The trial court disagreed with Mr. Coleman's claims of ownership. Incorporating by reference its Memorandum Opinion dated October 5, 2012, the trial court entered an interlocutory Judgment of Dismissal as to Plaintiff's Claim for Declaratory Relief and Granting Judgment for Declaratory Relief as to Ownership of the Eastowne Entities. Regarding the ownership of the capital stock and limited partnership interests in dispute, the court concluded as follows:

(a)     That the plaintiff Paul T. Coleman owns twenty-five percent (25%) of the shares of Eastowne Village, Inc.

-4-

(b) That the defendant Jennifer J. Fowler, as personal representative of the estate of John B. Fowler, owns twenty-five percent (25%) of the shares of Eastowne Village, Inc.

(c) That the defendants Billie A. Brown and David G. Brown, Jr., as co-personal representatives of the estate of David G. Brown, Sr., own fifty percent (50%) of the shares of Eastowne Village, Inc.

(d) That the plaintiff Paul T. Coleman owns 24.75% of Eastowne Partners I, Ltd., and Eastowne Partners II, Ltd., as a limited partner therein.

(e) That the defendant Jennifer J. Fowler, as personal representative of the estate of John B. Fowler, owns 24.75% of Eastowne Partners I, Ltd., and Eastowne Partners II, Ltd., as assignee of the deceased limited partner, John B. Fowler, as defined under the Tennessee Limited Partnership Act at the time that the limited partnership agreements were executed on June 7, 1985.

(f) That the defendants Billie A. Brown and David G. Brown, Jr., as co-personal representatives of the estate of David G. Brown, Sr., own 49.5% of Eastowne Partners I, Ltd., and Eastowne Partners II, Ltd., as assignee of the deceased limited partner, David G. Brown, Sr., as defined under the Tennessee Limited Partnership Act at the time that the limited partnership agreements were executed on June 7, 1985.

(g) That the defendant, Eastowne Village, Inc., owns one percent (1%) of Eastowne Partners I, Ltd., and Eastowne Partners II, Ltd., as the general partner therein.

The trial court reserved other issues for further hearing. Following the entry of this interlocutory order, the parties filed a joint motion for final order and requested a dismissal of all remaining claims in the consolidated action. On May 29, 2013, the trial court entered the final order. Mr. Coleman timely appealed.

II. Issues Presented

Mr. Coleman presents the following issues for our review, which we have restated slightly:

1. Whether the trial court erred in failing to enforce the EVI buy-sell

agreement such that Mr. Coleman is the sole remaining shareholder of capital stock.

2. Whether the trial court erred by interpreting the limited partnership agreements as allowing the decedents' estates to become partners.

3. Whether the trial court erred in holding that the formula price for purchase of respective interests had to be determined at a future hearing.

## III.  Standard of Review

The standard of review is *de novo* with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *McCarty v. McCarty*, 863 S.W.2d 716, 719 (Tenn. Ct. App. 1992). No presumption of correctness attaches to the trial court's legal conclusions. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

The "cardinal rule" of contract interpretation is to ascertain the intent of the parties and effectuate same, consistent with legal principles. *See Frizzell Constr. Co. v. Gatlinburg, LLC*, 9 S.W.3d 79, 85 (Tenn. 1999). When the language of the agreement is plain and unambiguous, courts determine the intent of the parties from the four corners of the document and enforce it as written. *See Int'l Flight Ctr. v. City of Murfreesboro*, 45 S.W.3d 565, 570 (Tenn. Ct. App. 2000). If the agreement's provisions are "susceptible to more than one reasonable interpretation," however, the terms of the contract are rendered ambiguous. *See Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). "Where the terms of the contract are ambiguous, the intention of the parties cannot be determined by a literal interpretation of the language, and the courts must resort to other rules of construction." *Id.* "[W]hen a contractual provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract." *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006).

## IV.  Ownership of EVI

Mr. Coleman asserts that the trial court erred in holding that he is not the sole remaining shareholder of EVI pursuant to the terms of the corporation's buy-sell agreement. The buy-sell agreement, signed by all shareholders at the time the corporation was formed, states in relevant part:

Purchase on Death

2.      On the death of a Shareholder (hereinafter referred to as the Decedent) all of the shares of the capital stock of the Corporation owned by him and which he or his personal representative shall be entitled, shall be sold and purchased as provided in this Agreement.

Obligation of Corporation to Purchase

 (a)      The Corporation shall purchase from the Decedent's personal representatives, and the Decedent's personal representatives shall sell to the Corporation, all of the shares of capital stock of the Corporation owned by the Decedent and which the Decedent or his personal representatives shall be entitled, at the price set forth in Paragraph 3 hereof.

Closing

(b)      The closing of such purchase and sale shall take place at the office of the Corporation at a date designated by the Corporation, which shall not be more than ninety (90) days following the date of qualification of the personal representatives and not less than ten (10) days following such date; provided, however, said closing shall take place regardless of the date of qualification of the personal representatives within six (6) months of the date of death of the Decedent.

. . .

Inability or Unwillingness to Purchase

(e)      If the Corporation shall not have sufficient assets to permit it lawfully to purchase all of such shares of capital stock, or if the Corporation in any event shall be unable or refuse to purchase all of the Decedent's shares of capital stock, the obligation of the Corporation with respect to the shares which the Corporation shall be unable to purchase shall be deemed assumed by the surviving Shareholders.

-7-

. . .

Purchase Price

3.     The price of the capital stock of each Shareholder to be
sold pursuant to this Agreement shall be the book value
of the shares as determined on the last day of the month
immediately preceding such date of death or termination
of employment . . . . For the purpose of determining
book value under the terms of this Agreement, the book
value shall be determined by adding, as of any such date,
the capital, surplus, and undivided profits, and after
having deducted any reserves theretofore established; the
sum of these items shall be divided by the number of
shares of capital stock outstanding as of said date, and
the said quotient shall represent the book value of each
share of capital stock of the Corporation.

As the trial court observed, Mr. Coleman's position at the hearing was that the shares
of each shareholder maintained a negative book value on the date of the deaths of Mr. Brown
and Mr. Fowler, such that the corporation had no obligation to take any action in order to
acquire their shares. According to Mr. Coleman's theory, as there was no value to be paid
to the decedents' personal representatives for the shares *sub judice*, ownership of the shares
should have automatically vested in the corporation. In the alternative, Mr. Coleman argued
at trial that if the corporation failed to act to purchase the decedents' shares, that right passed
to him as surviving shareholder, with no time limit upon his ability to purchase. Therefore,
Mr. Coleman contends that his September 1, 2011 letter to the personal representatives of the
decedents purporting to exercise such right to purchase was effective to transfer ownership
of the decedents' shares to him.

The trial court's memorandum opinion states in pertinent part:

As set out above, the buy sell agreement imposed upon the corporation the
obligation to buy the deceased shareholders' stock within "ninety (90) days
following the date of the qualification of the personal representatives and not
less than ten (10) days following such date" and with the proviso that the
"closing shall take place regardless of the date of qualification of the personal
representatives within six (6) months of the date of death of the Decedent."
The agreement also provides that "if the Corporation in any event shall be
unable or refuse to purchase all of the Decedent's shares of capital stock, the

obligation of the corporation with respect to the shares which the corporation shall be unable to purchase shall be deemed assumed by the surviving shareholders." The record is unclear as to the dates upon which the personal representatives qualified; however, the record is clear that the corporation did not ever seek to purchase the shares of the deceased shareholders. Rather, by his letter dated September 1, 2011, more than five (5) years after the death of the deceased shareholders in 2006, the plaintiff purported to exercise the right to purchase the shares of the deceased shareholders under the language of the agreement that "if the corporation in any event shall be unable or refuse to purchase all of the Decedent's shares of capital stock, the obligation of the corporation with respect to the shares which the corporation shall be unable to purchase shall be deemed assumed by the surviving shareholders." The "obligation of the corporation," under which the plaintiff purported to act, had a window of six (6) months after the dates of the deaths of the deceased shareholders. The windows passed four (4) to five (5) years before the plaintiff purported to act. To excuse his delay, the plaintiff states that he forgot about the buy sell agreement. At most, if not subject to the corporation's six (6) month window from the dates of death or some other limitations' period that expired prior to September 1, 2011, the plaintiff's right to purchase the stock is limited to "a reasonable time period." *See Minor v. Minor*, 863 S.W.2d 51, 54 (Tenn. Ct. App. 1993) ("Where no provision is made in a contract for performance, a reasonable time is implied."). The corporation and the plaintiff have waived the right to redeem or purchase the deceased shareholders' shares. *See Steven Harlamert v. World Finer Foods, Inc.*, 489 F.3d 767 (6th Cir. 2007). The shares of each deceased shareholder remain in his probate estate. However, the plaintiff further argues that no payment is due for the shares and, therefore, the corporation had no performance to render. Yet, there is nothing in the buy sell agreement to render the shares as automatically transferred. Neither the corporation nor the plaintiff asserted any such right to any such shares until the plaintiff's letter of September 1, 2011, and made no call for the shares or for any closing on the shares until the plaintiff's letter of September 1, 2011.

We agree with the trial court that the provisions of the buy-sell agreement are unambiguous and do not mandate an automatic transfer of the stock belonging to the deceased shareholders either to the corporation or to the surviving shareholder. The agreement provides that such stock shall be <u>purchased</u> and that a <u>closing</u> on the purchase will take place within six months of the date of the respective shareholder's death. Clearly, this purchase and closing did not occur within six months of either shareholder's death.

The buy-sell agreement further provides that if the corporation is unable or unwilling to purchase the deceased shareholder's stock, that obligation will be assumed by the surviving shareholder. In this case, the surviving shareholder is Mr. Coleman. Mr. Coleman, however, failed to act upon this contractual right for more than five years from the date of the decedents' deaths. Although the buy-sell agreement does not provide a specific time limit for the exercise of this right by the surviving shareholder, we agree with the trial court's conclusion that a reasonable time should be implied. As this Court stated in *Minor v. Minor*, 863 S.W.2d 51, 54 (Tenn. Ct. App. 1993):

> Where no provision is made in the contract for performance, a reasonable time is implied. Completion of a contract within a reasonable time is sufficient if no time is stipulated. Where the parties have not clearly expressed the duration of the contract, or where the duration of the contract is indefinite, the courts will imply that they intended performance to continue for a reasonable time. 17A Am. Jur. 2d Contracts § 479 (1991). "What constitutes a reasonable time within which an act is to be performed where a contract is silent upon the subject depends on the subject matter of the contract, the situation of the parties, their intention in what they contemplated at the time the contract was made, and the circumstances attending the performance." *Id*. § 480.

> It has long been held in this jurisdiction that contract terms may be implied in appropriate cases. *Dunlap Lumber Co. v. Nashville, C. & St. L. Ry. Co.*, 129 Tenn. 163, 175, 165 S.W. 224 (1914); *Hoskins v. United States*, 299 F. Supp. 1229, 1232 (E. D. Tenn. 1969), aff'd, 425 F.2d 1301 (6th Cir. 1970); *Hickman, Williams and Co. v. Ingram Coal Co.*, 601 F. Supp. 5 (M. D. Tenn. 1984); *Bailey v. Chattem, Inc.*, 684 F.2d 386, 396 (6th Cir. 1982); *Hamblen County v. City of Morristown*, 656 S.W.2d 331, 334 (Tenn. 1983). A contract must be construed with reference to the situation of the parties, the business to which it relates and its subject matter. 7 Tn. Juris. *Contracts*, § 56 (1983).

In *Minor*, this Court was asked to rule upon the enforceability of a reconciliation and property settlement agreement signed by the parties twelve years prior to their divorce. *Id*. at 53. The agreement recited that the parties were estranged and desired to reconcile. Should the reconciliation fail, the parties' property and alimony rights upon divorce would be controlled by the agreement. *Id*. The parties reconciled and remained married for twelve years. Upon their eventual divorce, the husband sought to enforce the agreement. *Id*. The trial court enforced the reconciliation agreement, but this Court reversed, holding that the delay of twelve years was unreasonable for enforcement of the agreement based upon the circumstances. *Id*. at 54.

Similarly, Mr. Coleman's right to purchase the decedents' shares pursuant to the buy-sell agreement should be subject to a reasonable time limitation. Based on the circumstances of the parties and the subject matter to which the agreement relates, we conclude that Mr. Coleman's attempt to exercise his right to purchase the shares of capital stock more than five years after the deaths of Mr. Brown and Mr. Fowler was not within a reasonable time. The corporation at issue was an ongoing business entity responsible for the management of an apartment complex, thus affecting the lives of a multitude of tenants. It was unreasonable for Mr. Coleman to wait more than five years to attempt to acquire the corporate shares of the decedents, meanwhile doing nothing to participate in the day-to-day operations of EVI or the property it controlled.

For similar reasons, we also conclude that enforcement of the buy-sell agreement is barred by the doctrines of laches and equitable estoppel rather than waiver.[1] The trial court found that Mr. Coleman had waived the right to redeem or purchase the deceased shareholders' shares, citing *Steven Harlamert v. World Finer Foods, Inc.*, 489 F.3d 767 (6th Cir. 2007). We note, however, that waiver "is proven by a clear, unequivocal and decisive act of the party, showing a purpose to forgo the right or benefit which is waived." *Crye-Leike, Inc. v. Carver*, 415 S.W.3d 808, 821 (Tenn. Ct. App. 2011) (quoting *GuestHouse Intern., LLC v. Shoney's N. Am. Corp.*, 330 S.W.3d 166, 202 (Tenn. Ct. App. 2010)). In other words, waiver requires demonstration of the party's intent to voluntarily relinquish a known right. *Lasater v. Hawkins*, No. M2010-01495-COA-R3-CV, 2011 WL 4790971 at *7 (Tenn. Ct. App. Oct. 10, 2011). Upon our review of the evidence and record, we conclude that no such intent was shown in this case.

Laches, on the other hand, "does not depend on the intent of the party against whom it is asserted." *Id.* As this Court has explained:

A judgment based on laches "is predicated on the trial court's finding of inexcusable, negligent, or unreasonable delay on the party asserting the claim which results in prejudice to the defending party. It is an equitable defense which requires the finder of fact to determine whether it would be inequitable or unjust to enforce the claimant's rights." *Finova Capital Corp. v. Regel*, 195 S.W.3d 656, 660 (Tenn. Ct. App. 2005) (citing *Gleason v. Gleason*, 164 S.W.3d 588, 592 (Tenn. Ct. App. 2004)).

The defense of laches is based on the principle that "equity will not

---

[1]Both of these affirmative defenses were pled by the defendants. This Court may affirm a decree of the trial court that is correct in result, though rendered upon different or erroneous grounds. *See Hopkins v. Hopkins*, 572 S.W.2d 639, 641 (Tenn. 1978).

intervene on behalf of one who has delayed unreasonably in pursuing his rights." *Hannewald v. Fairfield Communities, Inc.*, 651 S.W.2d 222, 228 (Tenn. Ct. App. 1983). "Laches, however, requires more than mere delay. It requires an unreasonable delay that prejudices the party seeking to employ laches as a defense, and it depends on the facts and circumstances of each individual case." *Id*. (citing *Brister v. Estate of Brubaker*, 336 S.W.2d 326, 332 (Tenn. Ct. App. 1960)).

*Id*. *See also Jansen v. Clayton*, 816 S.W.2d 49, 52 (Tenn. Ct. App. 1991) (laches involves "an inexcusably long delay coupled with injury to the rights of another resulting from the delay," and such injury can include death of witnesses, loss of evidence, and payment of taxes made by the defendants).

In the case at bar, Mr. Coleman waited more than five years after the deaths of Mr. Brown and Mr. Fowler to attempt to exercise his right to purchase their shares of capital stock in EVI. As the trial court found, this constituted an unreasonable delay. During that period of time, Ms. Brown and Ms. Fowler assumed the roles previously filled by their deceased spouses in order to conduct the corporation's business. They performed yearly corporate filings with the state, and Ms. Brown, through Brown, Brown & West, continued to manage the apartment complex and handle corporate affairs. Ms. Fowler testified at trial that she attempted to call a shareholders' meeting for EVI with no success. Both Ms. Brown and Ms. Fowler testified that their efforts to "maintain the status quo" were met with absolutely no assistance or support from Mr. Coleman. Additionally, Ms. Brown testified that she had no knowledge of the buy-sell agreement prior to its production by Mr. Coleman in 2011 during the course of the instant litigation.

The proof is undisputed that Mr. Coleman is a business and tax attorney and that he not only maintained possession of the buy-sell agreement but also drafted it. Mr. Coleman admitted that although he was aware that Ms. Brown and Ms. Fowler were managing the corporation and filing documents to perpetuate its existence following the deaths of their husbands, he took no action. Mr. Coleman claimed that he had forgotten about the existence of the buy-sell agreement until he saw a reference to it on a stock certificate during the pendency of the present action.

Upon the facts and circumstances above outlined, we conclude that based on the doctrine of laches, Mr. Coleman should be barred from now enforcing his contractual rights as surviving shareholder under the buy-sell agreement. Waiting over five years to assert his rights constituted an unreasonable delay, and the evidence demonstrated that Ms. Brown and Ms. Fowler were prejudiced thereby. It would be unjust to allow Mr. Coleman to claim the benefit of the buy-sell agreement at this point when Ms. Brown and Ms. Fowler have been

working for more than five years to maintain EVI as a viable business entity.

Similarly, equitable estoppel is proven through the action or inaction of a party who misleads another into changing her position to her detriment, regardless of whether ill motive or intent is shown. *See E & A Ne. Ltd. P'ship v. Music City Record Distrib., Inc.*, No. M2005-01207-COA-R3-CV, 2007 WL 858779 at *7 (Tenn. Ct. App. Mar. 21, 2007); *Smith v. Smith*, No. M2004-00257-COA-R3-CV, 2005 WL 3132370 at *6 (Tenn. Ct. App. Nov. 22, 2005). This Court has generally defined such estoppel as:

> the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

*E & A Ne. Ltd. P'ship*, 2007 WL 858779 at *7 (quoting *Beazley v. Turgeon*, 772 S.W.2d 53, 58 (Tenn. Ct. App. 1988)). This Court has further defined the required elements of equitable estoppel as follows:

> The doctrine of equitable estoppel requires evidence of the following elements with respect to the party against whom estoppel is asserted:
>
> > (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) Intention, or at least expectation that such conduct shall be acted upon by the other party; (3) Knowledge, actual or constructive of the real facts.
>
> Equitable estoppel also requires the following elements with respect to the party asserting estoppel:
>
> > (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) Reliance upon the conduct of the party estopped; and (3) Action based thereon of such a character as to change his position prejudicially.

*Smith*, 2005 WL 3132370 at* 7 (citing *Osborne v. Mountain Life Ins. Co.*, 130 S.W.3d 769,

774 (Tenn. 2004)). "To give rise to estoppel by silence or inaction, there must be not only an opportunity to speak or act, but also an obligation to do so." *E & A Ne. Ltd. P'ship*, 2007 WL 858779 at *7.

In the case at bar, Mr. Coleman failed to act for over five years upon his right to purchase the corporate shares of the deceased shareholders as provided in the buy-sell agreement. As the trial court found, this delay was unreasonable. Mr. Coleman drafted the buy-sell agreement and maintained it in his files, and there was no showing that either Ms. Brown or Ms. Fowler had any knowledge of its existence. By waiting so long to exercise his right or otherwise make known that the buy-sell agreement existed, Mr. Coleman induced Ms. Brown and Ms. Fowler to continue sustaining the corporation and its assets without his assistance or participation. Ms. Brown and Ms. Fowler obviously relied upon Mr. Coleman's silence and inaction, and they continued to expend their time and effort to maintain the viability of EVI. As stated previously, to permit Mr. Coleman now to assert his right to purchase the deceased shareholders' shares, thereby profiting from the efforts of Ms. Brown and Ms. Fowler to their detriment, would be inequitable. We agree with the trial court that Mr. Coleman's rights pursuant to the buy-sell agreement should not be enforced to that end. Therefore, the shares of capital stock of the deceased shareholders are held by the personal representatives as assets of the respective estates for proper administration.

## V. The Limited Partnerships

Mr. Coleman asserts that the trial court erred in its interpretation of the limited partnership agreements for Eastowne I and II because these agreements demonstrate the partners' intent that the interests of a deceased partner be liquidated and not inherited by his heirs. Mr. Coleman contends that the partnership agreements did not require any affirmative action in order for the limited partnerships to acquire the interests of the decedents. The partnership agreements for the two partnerships are substantially similar in language. Both agreements contain a provision included at section 7.1, which states:

> No Limited Partner shall, except with the unanimous consent of the General Partners, sell, assign, pledge, hypothecate, grant a security interest in or in any other manner transfer or encumber his or its interest in the Partnership.

Both agreements also contain a provision at section 7.3, which states:

> In the event of the death or adjudication of bankruptcy of a Partner, the interest of such deceased or bankrupt Partner **shall be subject to liquidation as provided hereafter**. The

-14-

Partnership **shall pay** to the estate of the deceased or bankrupt Partner an amount equal to the capital account of such Partner as of the preceding year end, increased by any contributions to capital made by him, and his share of Partnership gains and profits, for the current year and decreased by any withdrawals made by him, and his share of Partnership losses, for the current year, which amount **shall be paid to his estate within nine (9) months from the date of death** or adjudication of bankruptcy. The interest of a deceased or bankrupt Partner shall also be subject to an option to purchase exercisable in proportionate amounts, by all other Partners herein who constitute the spouse or children of the deceased or bankrupt Partner. If one or more of such optionees chooses not to exercise his option rights, the remaining optionees shall have the right to purchase the entire interest of such deceased or bankrupt Partner. The option price shall be equal to the amount that would otherwise be paid by the Partnership in liquidation of the capital account of the deceased or bankrupt Partner, and the option shall be exercised by the giving of notice by the optionees to any representative of the deceased or bankrupt Partner and to the Partnership within six (6) months from the date of death or adjudication of bankruptcy. Upon the exercise of this option, the obligation of the Partnership to liquidate the account of the deceased or bankrupt partner shall terminate. The matters set forth herein represent a binding obligation upon the estate of a deceased or bankrupt Partner and shall be enforceable against the heirs, representatives, assigns, creditors and successors in interest to a deceased or bankrupt Partner.

(Emphasis added.)

With reference to the limited partnerships, the trial court found:

[P]laintiff never took the position that the limited partnerships were going to liquidate the deceased partners' interests until his new counsel filed the plaintiff's amended and restated complaint on January 18, 2011. However, upon the deaths of the deceased partners in 2006, the plaintiff, who has maintained that he continued to occupy the office of vice president of the corporate general partner, was vested with the duties of the corporation's deceased president. The plaintiff could have taken action on behalf of the

-15-

corporate general partner to direct the limited partnerships to acquire the deceased limited partners' interests. Alternatively, the plaintiff could have called and held a stockholders and directors' meeting for the purpose of electing himself as president and directing that he, as the president, take action to result in the limited partnerships' acquisition of the deceased partners' interests. However, the plaintiff took no such action on behalf of the corporate general partner to cause the limited partnerships to acquire the interests of the deceased limited partners until his new counsel filed his amended and restated complaint on January 18, 2011. Likewise, the plaintiff himself, acting individually, took no such action until his new counsel's filing of his amended and restated complaint on January 18, 2011. The corporate general partner has never taken any action to effectuate the limited partnerships' purchase of the deceased limited partners' interests. Likewise, the plaintiff himself, acting individually, took no such action, assuming his right to [do] so, until his new counsel's filing of his amended and restated complaint on January 18, 2011.

As the trial court found, Mr. Coleman did nothing upon the deaths of Mr. Brown and Mr. Fowler to effectuate the provisions of the limited partnership agreements. The partnership agreements unambiguously provide that the "Partnership shall pay to the estate of the deceased or bankrupt Partner" the formula price for the deceased partner's interest within nine months of the deceased partner's death. Assuming, *arguendo*, that the formula price was calculated to be zero, as Mr. Coleman contends, the agreements clearly mandate some affirmative act by the respective partnership to liquidate the deceased limited partner's interest. If the intent of the parties was that the partnership agreements would provide that such liquidation and transfer of the deceased partner's interest be automatic upon death, the agreements should have specifically so stated. Instead, the limited partnership agreements provide that the interest of a deceased partner is "subject to liquidation."

For the reasons explained above with regard to EVI, we likewise conclude that upon the deaths of Mr. Brown and Mr. Fowler, Mr. Coleman was required to act within a reasonable time on behalf of the partnerships to liquidate the interests of the deceased limited partners in Eastowne I and II. Having failed to do so, he cannot now seek to liquidate those interests to the detriment of Ms. Brown and Ms. Fowler, who have acted on behalf of the limited partnerships for over five years to maintain the partnerships' assets. As with EVI, to allow Mr. Coleman to assert his right to liquidate the deceased partners' interests at this point in time, thereby profiting from the efforts of Ms. Brown and Ms. Fowler to sustain the viability of the partnerships' assets to their detriment, would be inequitable. The trial court properly held that the decedents' ownership interests in the partnerships could not now be liquidated by Mr. Coleman. Instead, those partnership interests are held by the personal

representatives of the respective estates for proper administration.[2]

Mr. Coleman contends that the trial court erred by placing the burden on him at trial to prove that the defendants were not lawful partners. Mr. Coleman mischaracterizes the trial court's comments. A review of the trial court's memorandum opinion demonstrates that the trial court thoroughly reviewed and considered the provisions of the partnership agreements and concluded that Mr. Coleman had failed to fulfill his duty as an officer/director of the corporate general partner or as a surviving limited partner to ensure that the interests of the deceased partners were properly liquidated within a reasonable time frame. As such, the trial court determined that Mr. Coleman could not now undertake such action and, for the reasons stated above, we agree.

In reaching the previous conclusions, we note, however, that the trial court did not determine that the heirs of Mr. Brown and Mr. Fowler are now limited partners in the partnerships. We likewise make no such determination. The Tennessee Uniform Limited Partnership Act in effect in 1985 when these partnership agreements were executed clearly provided that a "limited partner's interest in the partnership is personal property," and that ownership or assignment of a limited partner's interest did not necessarily lead to the conclusion that the owner or assignee was a limited partner. *See* Tenn. Code Ann. § 61-2-118, 119[3] (1986). Further, the Act expressly stated that upon the death of a limited partner,

---

[2]We note that the deceased limited partners never assigned their interests to anyone, and they were prohibited from doing so by the terms of the limited partnership agreements. Therefore, contrary to the trial court's determination, the personal representatives are not the assignees of the deceased limited partners. Rather, the relevant statute provides that "[o]n the death of a limited partner, his executor or administrator shall have all the rights of a limited partner for the purpose of settling his estate, and such power as the deceased had to constitute his assignee a substituted limited partner." Tenn. Code Ann. § 61-2-121(a) (1986). As stated, the limited partnership agreements did not allow the deceased limited partners to assign their partnership interests. Thus, the only action the personal representatives could take, pursuant to the statute, would be to exercise the rights of a limited partner for the purpose of settling the respective estates.

[3]Tennessee Code Annotated § 61-2-119 (1986) provided:

(a) A limited partner's interest is assignable.

(b) A substituted limited partner is a person admitted to all the rights of a limited partner who has died or has assigned his interest in a partnership.

(c) An assignee who does not become a substituted limited partner, has no right to require any information on account of the partnership transactions or to inspect the partnership books; he is only entitled to receive the share of the profits or other compensation by way of income, or the return of his contribution, to which his assignor would otherwise be

(continued...)

-17-

his personal representative(s) would have all the rights of a limited partner for the purpose of settling his estate. *See* Tenn. Code Ann. § 61-2-121 (1986). We affirm the trial court's determinations regarding ownership of the limited partnerships and EVI stock, with the modification that the personal representatives should not be designated as assignees. Rather, we conclude that the personal representatives hold the decedents' ownership interests in the capital stock and limited partnerships as assets of the respective estates for proper administration. We remand this case to the trial court for further proceedings consistent with this opinion.

## VI. Remaining Issues

Mr. Coleman has raised other issues with regard to the trial court proceedings; however, the trial court's final order clearly expresses that only the ownership interests in the corporation and limited partnerships were being adjudicated. We therefore hold that any other issues raised are not yet ripe for appeal. *See Dorrier v. Dark*, 537 S.W.2d 888, 890 (Tenn. 1976) (holding that appellate courts are "limited in authority to the adjudication of issues that are presented and decided in the trial courts"); *see also Hayes v. Gentry*, No. 03A01-9303-CH-00120, 1993 WL 191999 at *2 (Tenn. Ct. App. June 8, 1993) ("[S]ince this issue was not adjudicated in the trial court, we cannot consider it on appeal.").

## VII. Conclusion

The judgment of the trial court delineating the respective ownership interests of the

---

[3](...continued)
entitled.

(d) An assignee shall have the right to become a substituted limited partner if all the members (except the assignor) consent thereto or if the assignor, being thereunto empowered by the certificate, gives the assignee that right.

(e) An assignee becomes a substituted limited partner when the certificate is appropriately amended in accordance with § 61-2-125.

(f) The substituted limited partner has all the rights and powers and is subject to all the restrictions and liabilities of his assignor, except those liabilities of which he was ignorant at the time he became a limited partner and which could not be ascertained from the certificate.

(g) The substitution of the assignee as a limited partner does not release the assignor from liability to the partnership under §§ 61-2-106 and 61-2-117.

parties in EVI and Eastowne I and II is affirmed with the modification that the personal representatives are not designated as assignees. Costs on appeal are taxed to the appellant, Paul T. Coleman. This case is remanded to the trial court, pursuant to applicable law, for further proceedings consistent with this opinion.


_____
THOMAS R. FRIERSON, II, JUDGE